UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUZETTE DE SOUZA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF NEW YORK; NEW YORK STATE OFFICE FOR PEOPLE WITH DEVELOPMENTAL DISABILITIES; WILLOW BAER, Acting Commissioner (in her official capacity); STEPHANIE THOMAS, Designee for Reasonable Accommodations (in her official and personal capacities); TERESA MEADOWS, Treatment Team Leader at Cleveland IRA (in her official and personal capacities); DAWN WILSON, Deputy Director of State Operations (in her official and personal capacities); SHERMARKE TANNIS, Regional Director of Human Resources (in his official and personal capacities); SHAUNA CARTER, Associate Director of Human Resources (in her official and personal capacities); COREEN PAYNE, Developmental Disabilities Program Specialist IV (in her official and personal capacities); and CIVIL SERVICE EMPLOYEES ASSOCIATION, INC., LOCAL 1000, AFSCME, AFL-CIO,<br><br>Defendants. | 25-CV-1222 (RA)<br><br>OPINION AND ORDER |

RONNIE ABRAMS, United States District Judge:

This case concerns the extent to which a state agency and a public-sector union, bound by a collective bargaining agreement that assigns shifts by seniority, must accommodate employees who observe the Sabbath. Plaintiff Suzette De Souza is a Seventh Day Adventist who observes the Saturday Sabbath. She worked for a New York State agency and was repeatedly assigned Saturday shifts due to her lack of seniority. Her requests for religious accommodations—that she not be assigned Saturday shifts, or be permitted to voluntarily swap shifts with her co-workers—

were denied by the State, on the grounds that doing so would constitute a breach of the collective bargaining agreement it had signed with the union which represents De Souza.

De Souza now brings a series of claims centered around the denial of her requested religious accommodations.  The Defendants—New York State, individual employees at a New York State agency, and a union—move to dismiss these claims in their entirety.  For the reasons that follow, their motion is granted in part and denied in part.

## BACKGROUND[1]

Plaintiff Suzette De Souza was hired on August 24, 2023 as a direct support assistant for New York State's Office for People with Developmental Disabilities ("OPWDD").  Dkt. 59 ("Am. Compl.") ¶ 51.  She is a Seventh Day Adventist and observes the Saturday Sabbath.  *Id.* ¶ 53.  When she began her employment with OPWDD, she was assigned a Wednesday through Sunday shift, which conflicted with her Sabbath observance.  *Id.* ¶ 55.  On September 18, 2023, she made a written request for religious accommodation, namely that she be exempted from work during the Sabbath.  *Id.* ¶ 56.  Defendant Shermarke Tannis, Regional Director of Human Resources, told Defendant Dawn Wilson, OPWDD's Deputy Director of State Operations, that granting this accommodation request would violate OPWDD's collective bargaining agreement (the "CBA") with Defendant Civil Service Employees Association, Inc., Local 1000, AFSCME, AFL-CIO ("CSEA"), a union.  *Id.* ¶¶ 47, 60–61.  This request was officially denied by Defendant Stephanie Thomas, OPWDD's Designee for Reasonable Accommodations, on October 18, 2023.  *Id.* ¶¶ 39, 93.[2]

---

[1] The following facts are taken from the Amended Complaint, Dkt. 59, and assumed to be true for the purposes of this Opinion and Order resolving Defendants' motions to dismiss.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).

[2] In October and December 2023, Defendant Thomas also reached out to Defendant Shauna Carter, OPWDD's Associate Director of Human Resources, to determine if De Souza could transfer "to any vacancies that met her qualifications" with a Saturday pass day.  Am. Compl. ¶¶ 91–92, 105.  Both times, Carter responded that De Souza "was ineligible to transfer."  *Id.*

The CBA between CSEA and OPWDD "govern[s] the terms and conditions of Ms. De Souza's employment with OPWDD." *Id.* ¶ 49.  It provides that, in general, shifts are to be assigned based on seniority.  Shift assignment is governed by Section 44.2 of the CBA, which provides, in relevant part, that:

> Appointments and promotions to vacant positions in the noncompetitive service or assignment of employees to work locations and shifts shall be made on the basis of seniority, subject to the operating needs of a department or agency or component thereof, or subject to an identification of differences between employees with respect to relevant factors concerning the employee's ability to perform the required duties and responsibilities satisfactorily.

Dkt. 72, Ex. 1 ("CBA") § 44.2.[3]  The CBA contains two exceptions, pursuant to which the seniority system may be altered based on OPWDD's "operating needs" or "relevant factors concerning an employee's ability to perform the required duties and responsibilities satisfactorily."  *Id.*  The parties have not submitted the full CBA, but neither "operating needs" nor these "relevant factors" appear to be defined terms, and the parties agree that the CBA does not define these terms elsewhere.  Dkt. 97 ("Oral Arg. Tr.) at 9:6–19, 23:19–25, 29:1–18.  These same exceptions also appear in the provision of the CBA creating a seniority system governing the bidding of job vacancies.  CBA § 45; *see* Am. Compl. ¶ 69.

On October 3, 2023, Wilson contacted CSEA via email to seek a waiver of the CBA's seniority provisions so that OPWDD could offer De Souza an accommodation.  *Id.* ¶ 76.  An "unidentified person" told Wilson that CSEA would not waive these provisions.  *Id.* ¶ 77.

After her initial accommodation request was denied, De Souza "arranged voluntary shift swaps with her coworkers when she was assigned to work" on the Sabbath.  *Id.* ¶ 94.  De Souza's immediate supervisor, Defendant Coreen Payne, approved these swaps until November 17, 2023,

---

[3] The CBA also contains seniority provisions related to overtime, *see* CBA § 27, posting and bidding for job vacancies, *id.* § 45, and the scheduling of "pass days." *Id.* § 44.3; *see* Dkt. 97 ("Oral Arg. Tr.") at 6:14–18.  Only the provision related to shift scheduling is put at issue by the instant motion.

when Defendant Teresa Meadows, the Treatment Team Leader of the facility where De Souza worked, informed Payne that that Meadows would no longer approve such swaps. *Id.* ¶¶ 59–60, 95. The Complaint alleges that "[a]ccording to OPWDD's submissions to the [New York State Division of Human Rights ("NYSDHR")], employees are permitted to make work adjustments" such as voluntary shift swaps with other employees, "when approved by a supervisor." *Id.* ¶ 96. When De Souza asked Meadows why she would not approve these swaps, Meadows allegedly stated that De Souza should find another job that gives weekends off and that she "needs to choose because you cannot serve two masters as the Bible states." *Id.* ¶ 98.

De Souza then submitted a second written request for accommodation on December 3, 2023, in which she proposed that she swap shifts with a colleague who was willing to take her assigned Saturday shift. *Id.* ¶ 102. Meadows stated that this request "required CSEA's waiver, which she could not obtain." *Id.* ¶ 104. OPWDD formally denied this request for an accommodation on January 4, 2024, "citing the [CBA] as the basis for denial." *Id.* ¶ 106. According to De Souza, following this denial, she spoke with James Arnett, a Vice President of CSEA, who stated that she could get "up to 60 days of work adjustments." *Id.* ¶ 109. Defendants dispute that this is accurate, and the parties do not point to any provision of the CBA which would permit such work adjustments.

On January 8, 2024, De Souza filed a formal charge of discrimination with the NYSDHR. *Id.* ¶ 111. Five months later, on May 16, 2024, OPWDD informed her that she would be terminated within a week. *Id.* ¶ 112. OPWDD stated that the reason for her termination was her "frequent call-outs," namely, that De Souza missed her assigned shifts to observe the Sabbath. *Id.* ¶ 113. De Souza does not dispute that she did "call out" when not granted accommodations. Oral Arg. Tr. at 38:5–23.

4

De Souza brings a series of claims arising out of this sequence of events. She brings Title VII claims alleging (1) denial of a reasonable accommodation, (2) direct disparate treatment discrimination, and (3) retaliation against the State of New York and OPWDD (the "Institutional Defendants"), as well as CSEA. She brings a Section 1983 claim against Defendants Thomas, Meadows, Payne, Wilson, Tannis, and Carter (the "Individual Defendants" and, together with the Institutional Defendants, the "New York State Defendants") alleging that they violated her free exercise rights under the First Amendment. She brings New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL") claims against the Individual Defendants and CSEA, alleging parallel reasonable accommodation, disparate treatment, and retaliation claims. *Id.* ¶¶ 132–71.

She also includes class action allegations, seeking to certify a class of "all persons who have been or will be subjected to the practice and custom of OPWDD and CSEA of denying employees of OPWDD religious accommodations for [S]abbath observance, discriminating against [S]abbath observers by denying work adjustments and waivers for non-religious purposes, and taking adverse actions against such employees." *Id.* ¶ 116. This class appears to include both current and prospective employees. *Id.* ¶ 11.

De Souza relies on an individual identified as Confidential Witness 1, a former employee of OPWDD who was terminated allegedly because they asked for a Sabbath accommodation, and another Confidential Witness 2, who told De Souza that "there were several other [S]abbath keepers that did not receive accommodations to observe the [S]abbath" at OPWDD. *Id.* ¶¶ 119–20. Beyond that, she alleges, "on information and belief," that there are over one hundred OPWDD employees who would be class members. *Id.* ¶ 122. She further alleges that there "is a widespread policy and practice within OPWDD of denying [S]abbath keepers their rights to practice their

5

religion." *Id.* ¶ 7.

The New York State Defendants filed a motion to dismiss the Complaint or, alternatively, strike the class allegations, Dkt. 73 ("NYS Mot."), and CSEA filed a similar motion. Dkt. 70, Ex. 5 ("CSEA Mot."). De Souza opposed, Dkt. 76 ("Pl. Opp'n"), to which the Defendants replied. Dkt. 83 ("NYS Repl."); Dkt. 82 ("CSEA Repl."). Oral argument was held on March 4, 2026.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[4] Courts must therefore accept all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). At this stage, "the court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020).

## DISCUSSION

### I. Discrimination Under Title VII—Reasonable Accommodation

The Court begins by examining Defendants' motion to dismiss De Souza's reasonable accommodation claims under Title VII against the Institutional Defendants and CSEA. "Title VII . . . requires employers to accommodate the religious practice of their employees unless doing so would impose an 'undue hardship on the conduct of the employer's business.'" *Groff v. DeJoy*, 600 U.S. 447, 453–54 (2023) (quoting 42 U.S.C. § 2000e(j)). "Specifically, an employer may not fail or refuse to hire or discharge any individual, or otherwise discriminate against any individual

---

[4] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, omissions, and alterations.

with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's religion." *Baker v. The Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006).

Title VII forbids religious discrimination by labor unions as well. "In addition to prohibiting unions from discriminating themselves, Title VII also prohibits unions from 'causing or attempting to cause an employer to discriminate against an individual.'" *Carter v. Local 556, Transport Workers Union of Am.*, 156 F.4th 459, 490 (5th Cir. 2025) (quoting 42 U.S.C. § 2000e–2(c)). A union may therefore be liable "if it prevents an employer from fulfilling its statutory responsibilities under Title VII." *Id.* (quoting *Carter v. Chrysler Corp.*, 173 F.3d 693, 703 (8th Cir. 1999)), or "purposefully acts or refuses to act in a manner which prevents or obstructs a reasonable accommodation by the employer so as to cause the employer to discriminate on the basis of religion." *Chrysler Corp.*, 173 F.3d at 703–04. The crux of De Souza's theory of CSEA's liability appears to be that CSEA has the discretion to waive certain provisions of the CBA to accommodate De Souza's Sabbath observance, particularly as related to shift assignments, but did not do so. Am. Compl. ¶¶ 5–6, 80.

To establish a claim for failure to accommodate against an employer, a plaintiff must first make out a *prima facie* case of religious discrimination by demonstrating that "(1) they held a bona fide religious belief conflicting with an employment requirement; (2) they informed their employers of that belief; and (3) they were disciplined for failure to comply with the conflicting employment requirement." *Baker*, 445 F.3d at 546. "Once a prima facie case is established by the employee, the employer must offer him or her a reasonable accommodation, unless doing so would cause the employer to suffer an undue hardship." *Id.*

Likewise, to establish a claim for failure to accommodate against a union, a plaintiff must make out a *prima facie* case of religious discrimination by showing that "(1) a bona fide religious

practice conflicts with an employment requirement, (2) [they] brought the practice to the Union's attention, and (3) the religious practice was the basis for the adverse employment decision." *E.E.O.C. v. Unión Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 55 (1st Cir. 2002) (quoting *E.E.O.C. v. United Parcel Serv.*, 94 F.3d 314, 317 (7th Cir. 1996)).  The burden then shifts "to the union to show that it made a reasonable accommodation of the religious practice or show that any accommodation would result in undue hardship."  *Id.* (citing *Seaworth v. Pearson*, 203 F.3d 1056, 1057 (8th Cir. 2000), *cert. denied*, 531 U.S. 895 (2000)).[5]  Thus, De Souza's reasonable-accommodation claim against both the NYS Defendants and CSEA may be dismissed if the Court finds that her requested accommodations would, as a matter of law, result in undue hardship.  *See, e.g.*, *D'Cunha v. Northwell Health Sys.*, 2023 WL 7986441, at *2 (2d Cir. Nov. 17, 2023) (summary order); *Kauffman v. N.Y. Presbyterian Hosp.*, 762 F. Supp. 3d 309, 319 (S.D.N.Y. 2025) (collecting cases); *Cagle v. Weill Cornell Medicine*, 680 F. Supp. 3d 428, 436 (S.D.N.Y. 2023).

As a preliminary matter, Defendants do not appear to dispute that De Souza has made out a *prima facie* failure-to-accommodate case against both the State Defendants and the Union.  As De Souza notes, she has alleged that she holds a sincere religious belief that she may not "engage[] in secular work" on "the [S]abbath from sunset on Friday to sunset on Saturday every week."  Am. Compl. ¶ 53.  She has further alleged that she informed OPWDD of this belief during her job interview, *id.* ¶ 52, and after beginning her employment, when she submitted two written requests

---

[5] The parties do not appear to dispute that *Unión Independiente* provides the general framework for a *prima facie* failure-to-accommodate claim against a union.  Pl. Opp'n at 12–13; CSEA Repl. at 3.  As other courts have noted, however, "the prima facie elements of a religious discrimination case do not always fit nicely into a case against a labor union" because a union can neither "unilaterally discharge or discipline an employee" nor unilaterally "impose an employment obligation."  *Reed v. Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of Am.*, 569 F.3d 576, 580 (6th Cir. 2009), *overruled on other grounds by Bilyeu v. UT-Battelle, LLC*, 154 F.4th 396, 404–05 (6th Cir. 2025).  As a result, the Sixth Circuit has held that a plaintiff must "point to any action by" the union "that has adversely affected his employment" in order to satisfy the third prong of the *prima facie* case.  *Reed*, 569 F.3d at 581.

for accommodation, *id.* ¶¶ 56, 102. She has also alleged that she informed a union representative of this belief after receiving her job offer, *id.* ¶ 54, and "discussed the denial" of her second request for accommodation by OPWDD with James Arnett, a vice president of CSEA. *Id.* ¶ 109. Finally, De Souza alleges that, as to OPWDD, her requests for accommodation were denied, that she was placed on administrative leave, and that she was terminated for refusing to work during the Sabbath. *Id.* ¶¶ 93, 106, 112–14. As to CSEA, she alleges that it refused to waive the seniority provisions of the CBA to permit OPWDD to grant her the requested accommodations, thereby preventing or obstructing OPWDD from doing so. *Id.* ¶¶ 6, 80.[6]

De Souza asserts that she is entitled to three reasonable accommodations. First, she asserts that the New York State Defendants should have accommodated her by not scheduling her to work on the Sabbath. Pl. Opp'n at 14. In the alternative, she asserts that the New York State Defendants should have approved voluntary shift swaps she arranged with her coworkers, which would have allowed her to trade her assigned Saturday shifts for shifts assigned to her colleagues on other days. *Id.* Finally, she asserts that she was entitled to use sixty days of temporary "work adjustments" to avoid working on Saturdays. *Id.* at 14–15.

Defendants respond that providing De Souza these requested accommodations would result in an undue hardship, primarily because doing so would cause OPWDD to violate the seniority system for shift assignments contained in the CBA. CSEA Mot. at 7; NYS Mot. at 13–14. "The [affirmative] defense of undue hardship may be raised by a pre-answer motion to dismiss under

---

[6] At oral argument, counsel for CSEA argued that De Souza has not made out a *prima facie* case against it because the Amended Complaint does not allege that CSEA was aware that De Souza was seeking a religious accommodation when it denied OPWDD's waiver request. Oral Arg. Tr. at 21:7–22:1; *see* Am. Compl. ¶ 76 ("In the email to CSEA, Ms. Wilson did not mention that Ms. De Souza was seeking a religious accommodation."). De Souza also alleges, however, that CSEA was aware of her accommodation needs because she informed Faye Wilkie-Fields, "the president of the Brooklyn Developmental Center Local of CSEA," that she would need the Sabbath off from work. *Id.* ¶ 54.

Rule 12(b)(6) if the defense appears on the face of the complaint." *D'Cunha*, 2023 WL 7986441, at *2 (summary order).

In short, Defendants argue that the Supreme Court's decision in *Trans World Airlines, Inc. v. Hardison* controls this case. 432 U.S. 63, 84 (1977); *see* NYS Opp'n at 12; NYS Repl. at 7; CSEA Mot. at 7; CSEA Repl. at 2–4. In *Hardison*, like in the instant case, the plaintiff-employee of defendant Trans World Airlines ("TWA") "was subject to a seniority system contained in a collective bargaining agreement" with the defendant union. *Id.* at 67. Under that system, "[t]he most senior employees have first choice for job and shift assignments, and the most junior employees are required to work when the union steward is unable to find enough people willing to work at a particular time or in a particular job to fill TWA's needs." *Id.*

Hardison's religion required that he observe the Sabbath, but he was "asked to work Saturdays when a fellow employee went on vacation." *Id.* at 68. TWA worked with the union to seek a change of work assignments for Hardison, but "the union was not willing to violate the seniority provisions set out in the collective-bargaining contract," and "Hardison had insufficient seniority to bid for a shift having Saturdays off." *Id.* Because "[t]here were no volunteers to relieve Hardison on Saturdays, . . . to give Hardison Saturdays off, TWA would have had to deprive another employee of his shift preference at least in part because he did not adhere to a religion that observed the Saturday Sabbath." *Id.* at 81. After several other proposed accommodations were rejected by the company, Hardison was discharged for refusing to work during his designated shift. *Id.* at 69. The *Hardison* court held that, under Title VII, "the duty to accommodate" does not require an employer "to take steps inconsistent with" a provision in an otherwise-valid collective bargaining agreement which assigns shifts based on seniority. *Id.* at 79; *accord Cosme v. Henderson*, 287 F.3d 152, 161 (2d Cir. 2002) (noting that "in the usual case,

10

employers are not required to breach an agreed-upon seniority system to accommodate the religious needs of employees"). *Hardison*'s holding rested on a determination that Title VII does not "require" an employer to "deny the shift and job preferences of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others." *Hardison*, 432 U.S. at 81. [7]

Decades later, in *Groff v. De Joy*, the Supreme Court clarified a portion of its holding in *Hardison* relating to the standard for an undue burden in reasonable-accommodation cases. 600 U.S. 447, 470 (2023). *Groff* stands for the proposition that an "undue hardship" requires something more than the "*de minimis*" standard articulated in *Hardison*, and that "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff*, 600 U.S. at 470. The *Groff* Court further counseled that "courts should resolve whether a hardship would be substantial in the context of an employer's business in the common-sense manner that it would use in applying any such test," but should "take[] into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer." *Id.* at 471; *see D'Cunha*, 2023 WL 7986441, at \*2 (construing *Groff*); *Conde v. Mid Hudson Reg'l Hosp. Med. Ctr.*, 2024 WL 168282, at \*7 (S.D.N.Y. Jan. 12, 2024) (same).

"[B]ecause *Groff* clarified *Hardison* rather than overruling it, *Hardison* and the lower court cases applying it remain valid to the extent they do not conflict with *Groff*." *Hall v. Sheppard Pratt Health Sys., Inc.*, 155 F.4th 747, 752 (4th Cir. 2025). In other words, the clarified undue

---

[7] The *Hardison* court cautioned, however, that its holding was limited to *seniority provisions* in collective-bargaining agreements, and noted that employers may not otherwise contract away their Title VII obligations. *Hardison*, 432 U.S. at 79. *Hardison* thus "dealt specifically with seniority provisions contained in CBAs, and [its] rationale rested on the unique features of seniority rights rather than those of collectively-bargained rights in general." *Odell v. Kalitta Air, LLC*, 678 F. Supp. 3d 904, 918 (E.D. Mich. 2023), *aff'd* 107 F.4th 523 (6th Cir. 2024).

burden standard the Supreme Court articulated in *Groff* does not disturb *Hardison*'s holding that it would constitute an undue hardship for an employer to take steps to accommodate an employee that would violate its obligations under the seniority provisions of a collective bargaining agreement. *See Hall*, 155 F.4th at 753; *DeVore v. Univ. of Ky. Bd. of Tr.*, 693 F. Supp. 3d 757, 765 (E.D. Ky. 2023). *Hardison* itself interpreted Title VII to categorically hold, as a matter of law, that "absent a discriminatory purpose, the operation of a seniority system cannot be an unlawful employment practice, even if the system has some discriminatory consequences." *Hardison*, 432 U.S. at 82. The *Groff* Court acknowledged that *Hardison* did not rely on the general undue burden standard, which *Groff* altered, to reach this holding. *Groff*, 600 U.S. at 464. Instead, *Hardison* relied on a finding that "seniority systems are afforded special treatment under Title VII itself." *Id.* at 462.

Here, Defendants argue that granting De Souza her requested accommodation would require OPWDD to breach the CBA's seniority provisions, which qualifies, under *Hardison*, as an undue hardship as a matter of law. As a result, they say, refusing to do so is not a breach of their reasonable accommodation obligations under Title VII. De Souza responds that *Hardison* is distinguishable because her three requested accommodations—not being assigned Saturday shifts in the first instance, permitting voluntary shift swaps, and exercising her alleged right to 60 days of work accommodations—would not cause OPWDD to breach the CBA, given its exceptions. Pl. Opp'n at 13–17. The Court agrees in part, and finds that De Souza has plausibly alleged that her request to not be assigned Saturday shifts and be permitted to engage in voluntary shift swaps constitute reasonable accommodations. Furthermore, it finds that "the face of the [Amended] Complaint," does not make clear that these accommodations constitute undue burdens as a matter of law. *D'Cunha*, 2023 WL 7986441, at *2.

### A. Shift Scheduling

De Souza's first argument is that, unlike the collective bargaining agreement at issue in *Hardison*, the CBA "contains two exceptions under which OPWDD could have accommodated [S]abbath keepers," by not scheduling them to work Saturday shifts, without violating its terms. Pl.'s Opp'n at 14.

This argument requires the Court to construe the terms of the CBA. When construing a contract on a motion to dismiss, courts "are not obliged to accept the allegations of the complaint as to how to construe a contract," *Pro. Fighters League, LLC v. Takeover Indus., Inc.*, 770 F. Supp. 3d 718, 724 (S.D.N.Y. 2025), though the Court must "resolve any contractual ambiguities in favor of the plaintiff." *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 86 (2d Cir. 2015). "A contract term is unambiguous if it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294–95 (2d Cir. 2015). "Words and phrases should be given their plain meaning and a contract should be construed so as to give full meaning and effect to all of its provisions." *Id.* at 295.

Section 44.2 of the CBA provides, in relevant part, that:

> [A]ssignment of employees to work locations and shifts shall be made on the basis of seniority, subject to the operating needs of a department or agency or component thereof, or subject to an identification of differences between employees with respect to relevant factors concerning the employee's ability to perform the required duties and responsibilities satisfactorily.

CBA § 44.2. De Souza argues that "[t]he need to make a religious accommodation could constitute an operating need, or it could constitute a factor concerning Ms. De Souza's ability to perform required duties." Pl. Opp'n at 14. In their reply, the New York State Defendants argue that this

13

clause is unambiguous and De Souza's interpretation of it is unreasonable.  NYS Repl. at 4–5.  On

their reading, "[t]he plain meaning of the 'operating needs' clause is that OPWDD must determine

the scope of its need for employees in various roles and geographic areas," to determine work

locations and shifts, and that the "ability to perform" clause "plainly pertains to an employee's

skills, licensure, and physical abilities."  *Id.* at 3.  Therefore, they argue, her interpretation of the

"CBA is so nebulous and broad" that it would allow "OPWDD to unilaterally choose when to

follow the seniority provisions," thereby rendering them "meaningless."  NYS Repl. at 4–5.  While

this interpretation may be a reasonable one, the New York State Defendants can point to no

language within the CBA that would compel such a reading.

The Court thus agrees with De Souza that the CBA's exceptions[8] to its seniority system

are ambiguous, and could support an interpretation which would permit OPWDD to grant her an

exemption from Saturday shifts.  Indeed, the New York State Defendants appear to admit as much

in their motion, where, in moving to strike the Amended Complaint's class-related allegations,

they argue that the "criteria for application of the CBA [seniority] exceptions constitute[]

undefined subjective criteria" because "operating needs" and "ability to perform duties

satisfactorily" are "vague and undefined phrases, open to different interpretations."  NYS Mot. at

44.  And as to CSEA's ability to waive the seniority provisions, the New York State Defendants

argue that the "criteria for waiving the CBA is simply absent and cannot be defined as subjective

or objective," because the CBA does not include any such criteria.  *Id.*

---

[8] At oral argument, counsel for the New York State Defendants argued that these clauses should not be considered "exceptions" to the CBA, and are instead "clauses that determine [the] overall need of the state for staffing [of] certain types of employees."  Oral Arg. Tr. at 50:19–24.  This strikes the Court as a distinction without a difference; the dispute here is over what accommodations are, and are not, permissible pursuant to these clauses, which vary the CBA's otherwise-strict seniority system.  For clarity, the Court will use the term "exception" to describe these clauses in this Opinion and Order.

14

The definitions of the key terms within these two exceptions, therefore, are ambiguous, because they are not clearly defined on the face of the CBA. Moreover, De Souza advances a facially plausible reading of these exceptions. She argues that OPWDD's need to comply with its obligations under federal antidiscrimination law by providing a reasonable accommodation could constitute an "operating need" under this exception, or her religious obligations could plausibly be considered as part of her "ability to perform" her job duties. Where "there are alternative, reasonable interpretations of a contract term rendering it ambiguous, the issue should be submitted to the trier of fact and is not suitable for disposition on a motion to dismiss." *Psenicska v. Twentieth Century Fox Film Corp.*, 2008 WL 4185752, at *4 (S.D.N.Y. Sept. 3, 2008). Accordingly, the Court cannot conclude, as a matter of law, that providing De Souza with a shift scheduling accommodation would cause OPWDD to violate the CBA's seniority provisions and thus constitute an undue burden.

## B. Voluntary Shift Swaps

The second alleged reasonable accommodation De Souza sought is that she be permitted to arrange voluntary shift swaps with her co-workers on an ongoing basis. In the Amended Complaint, De Souza alleges that she arranged four "voluntary shift swaps" with her co-workers when she was assigned to work on the Sabbath, but that her supervisor eventually informed her that Defendant Meadows, her Team Leader and Manager, would "no longer authorize such arrangements." Am. Compl. ¶¶ 94–95. She further alleges that, "[a]ccording to OPWDD's submissions to the NYSDHR, employees are permitted to make work adjustments when approved by a supervisor," and that OPWDD had a policy of "allowing supervisors to make voluntary shift swaps." *Id.* ¶¶ 96–97. De Souza argues that "[t]he practice of making voluntary shift swaps shows that it would not have violated the seniority plan to make additional voluntary shift swaps." Pl.

15

Opp'n at 14.  The Court agrees that De Souza has plausibly alleged that ongoing voluntary shift swaps could constitute a reasonable accommodation, and that the Amended Complaint does not facially demonstrate that such swaps constitute an undue burden as a matter of law.

### 1.  Reasonable Accommodation

The New York State Defendants first dispute that permitting a voluntary shift swap would constitute a "reasonable accommodation" for purposes of Title VII.  The Second Circuit has stated that, for any offer "to have been reasonable within the meaning of § 701(j), the proposed accommodation had to have eliminated the conflict between the employment requirement, working on Saturdays, and the employee's religious practice of not working on the Saturday Sabbath."  *Cosme*, 287 F.3d at 159; *see Baker*, 445 F.3d at 548 ("[T]he offered accommodation cannot be considered reasonable because it does not eliminate the conflict between the employment requirement and religious practice.").  Accordingly, the New York State Defendants argue that they could not offer voluntary shift swaps as a reasonable accommodation because De Souza "would still have been required to work during the Sabbath on occasions when a volunteer could not be found."  NYS Repl. at 9; NYS Mot. at 14 n.8.

Under certain circumstances, however, employer approval of voluntary shift swaps can constitute a reasonable accommodation, even if a plaintiff does not show that such a scheme will definitively eliminate the conflict between an employment requirement and their religious practice.  De Souza points to dicta in the *Groff* majority opinion indicating as much.  *Groff* dealt with a Postal Service worker who observed the Sunday Sabbath, and thus requested an exemption from Sunday work assignments.  600 U.S. at 454, 456.  The Court noted that:

> "Title VII requires that an employer reasonably accommodate an employee's
> practice of religion, not merely that it assess the reasonableness of a particular
> possible accommodation or accommodations. . . . Faced with an accommodation
> request like Groff's, it would not be enough for an employer to conclude that

16

> forcing other employees to work overtime would constitute an undue hardship. Consideration of other options, *such as voluntary shift swapping*, would also be necessary."

*Id.* at 473 (emphasis added). While the Second Circuit has declined to pass on whether voluntary shift swaps would constitute reasonable accommodations as a matter of law, *Baker*, 445 F.3d at 548, it has also noted with approval a decision from the Eleventh Circuit which held that allowing a plaintiff to "voluntarily swap shifts with other employees" is an accommodation which "satisfied the requirements of Title VII," *Genas v. State of N.Y. Dep't of Corr. Servs.*, 75 F.3d 825, 832 (2d Cir. 1996) (discussing *Beadle v. Hillsborough Cnty. Sheriff's Dep't*, 29 F.3d 589 (11th Cir. 1994)).

Other courts have reached a similar conclusion, although they have cautioned that this determination is fact-bound. In *E.E.O.C. v. Robert Bosch Corp.,* for example, the Sixth Circuit noted that "[m]erely granting employees permission to find volunteers to swap shifts, however, does not definitively constitute 'reasonable accommodation' as a matter of law in all cases," such as when employer practices "ma[ke] it virtually impossible to find replacements." 169 F. App'x 942, 944 (6th Cir. 2006); *see also Antoine v. First Student, Inc.*, 713 F.3d 824, 831 (5th Cir. 2013) (noting that "a seniority-based system permitting employees to choose their own shifts, combined with an employer's offer to approve any voluntary shift swaps that the employee enters into in a workplace where swapping is regular and accepted, constitutes a reasonable accommodation"); *Jamil v. Sessions*, 2017 WL 913601, at *10 (E.D.N.Y. Mar. 6, 2017) (concluding that voluntary shift swaps are not a reasonable accommodation because "as a practical matter, Plaintiff would never have been able to find enough officers who would voluntarily trade with [him] for his Friday night and Saturday shifts.").

Here, however, Defendants have not provided any specific reason as to why voluntary shift swapping would not constitute a reasonable accommodation as to De Souza—and in any event,

17

such a factual question is not suitable for resolution on a motion to dismiss.  De Souza has thus plausibly alleged that OPWDD's approval of voluntary shift swaps could constitute a reasonable accommodation.

### 2.  The CBA

Next, Defendants argue that permitting voluntary shift swapping on an ongoing basis would cause OPWDD to violate the CBA's seniority provisions, and thus constitute an undue burden as a matter of law.  CSEA argues that there "is no procedure in the CBA permitting shift swapping," and that "shift swaps on an ongoing or permanent basis would violate the contract seniority provisions."  CSEA Repl. at 4.  The New York State Defendants make a similar argument, stating that "[i]nformal shift swapping, particularly on a long-term basis," would violate the CBA because it would "allow a probationary employee, like Plaintiff, to choose a shift or a pass day that would otherwise be unavailable to her and would deprive a more senior employee of the ability to bid on this shift or pass day."  NYS Mot. at 15.  For these reasons, they state, "once it became clear that Plaintiff intended to continue to request shift swaps indefinitely, which would effectively jump the seniority system, OPWDD denied her request."  NYS Repl. at 5.

Defendants, however, do not point to a provision of the CBA which would permit the practice of incidental shift swaps—which the New York State Defendants acknowledge they have permitted, *see* NYS Repl. at 5—but not shift swaps "on an ongoing or permanent basis."  CSEA Repl. at 4; NYS Mot. at 15.  It is not clear from the face of the contract why permitting voluntary agreements between employees to swap shifts, after they have been assigned by OPWDD pursuant to the seniority plan, would violate OPWDD's obligations under the CBA.  Nor would swapping shifts after they have been so assigned "deprive a more senior employee of the ability to bid" on a particular shift, as De Souza would presumably be coming to an independent arrangement with

the employee with the winning bid. *Id.* What's more, the State Defendants' argument would apply to *any* voluntary shift swap, including the four shift swaps requested by De Souza and approved by OPWDD, which cuts against a finding that the CBA clearly forbids such swaps.

Because there does not appear to be a provision of the CBA which categorically permits or prevents voluntary shift swapping among employees, either on a temporary or permanent basis, the permissibility of voluntary shift swapping as accommodation is ambiguous under the contract. On a motion to dismiss, this ambiguity must be resolved in De Souza's favor, *Luitpold Pharms., Inc.* 784 F.3d at 86, and thus the Court cannot conclude, at this juncture, that permitting voluntary shift swaps on an ongoing basis would cause OPWDD to breach the CBA's seniority provisions. It is therefore unclear, "from the face of the [Amended Complaint]," that permitting De Souza to continue to engage in voluntary shift swaps would constitute an undue burden as a matter of law. *Chinchilla v. N.Y.C. Police Dep't*, 2024 WL 3400526, at *10 (S.D.N.Y. July 12, 2024).

## C. Temporary Work Adjustments

Finally, De Souza argues that CSEA's Vice President told her that she "had the right to 60 days" of temporary "work adjustments," which she did not receive, and which, "if approved, would have allowed defendants to accommodate Ms. De Souza's [S]abbath." Am. Compl. ¶¶ 109–10; Pl. Opp'n at 15. CSEA responds by claiming that the CBA does not give employees 60 days of "work adjustment" carve-outs to the seniority provisions. The New York State Defendants argue similarly, and also claim, as they did for voluntary shift swapping, that such a temporary work adjustment cannot constitute a reasonable accommodation. CSEA Repl. at 4; NYS Repl. at 6, 9.

On this issue, the Court agrees with the State Defendants. Even if De Souza was entitled to sixty days of work adjustments, they would definitionally be temporary and finite, unlike ongoing voluntary shift swaps. They therefore, as alleged, cannot independently constitute a

19

reasonable accommodation, because they cannot "eliminate the conflict between the employment requirement and religious practice" once they are exhausted, *Baker*, 445 F.3d at 548, and thus cannot form the basis of a Title VII reasonable-accommodation claim.

### D. Other Sources of Undue Hardship

Defendants argue, in the alternative, that even if OPWDD were permitted, under the CBA, to accommodate Plaintiff by agreeing to not schedule her work for Saturdays or by permitting voluntary shift swaps, doing so would nevertheless pose an undue burden on OPWDD. The New York State Defendants argue that doing so (1) would create employee morale and scheduling problems, and (2) create safety concerns. NYS Mot. at 16–17, 20.

Following the Supreme Court's decision in *Groff*, "undue hardship is adequately established only 'when a burden is substantial in the overall context of an employer's business.'" *Haczynska v. Mount Sinai Health Sys., Inc.*, 738 F. Supp. 3d 300, 321–22 (E.D.N.Y. 2024) (quoting *Groff*, 600 U.S. at 468). Defendants do not point to caselaw suggesting that, as a matter of law, potential employee morale issues and public safety concerns constitute undue burdens *per se*.[9] Absent such authority, "whether there is an undue burden is a question of fact for summary judgment or trial." *Langer v. Hartland Bd. of Educ.*, 2023 WL 6140792, at *7 (D. Conn. Sept. 20, 2023).

---

[9] The New York State Defendants rely on *Sides v. NYS Div. of State Police*, 2005 WL 1523557, at *6 (N.D.N.Y. June 28, 2005), which found, on a motion to dismiss, that a defendant police department demonstrated that particular Sabbath accommodations could pose a threat to public safety due to potential understaffing concerns. Defendants analogize De Souza's role at OPWDD to that of a police officer, arguing that "involves a non-traditional schedule and diligent care for some of the most vulnerable sections of the population," and that "any accommodation that puts the Institutional Defendants' ability to keep their facilities fully staffed at risk is an undue burden as a matter of law." NYS Mot. at 20.

In *Sides*, which was decided before the Supreme Court clarified the undue burden standard in *Groff*, the court determined that the defendant's "business" was "protecting the lives and property of a dependent citizenry," and that "a Trooper must be unconditionally available for work 24 hours a day 365 days a year" as a matter of "business necessity." 2005 WL 1523557, at *4. Here, by contrast, the connection between OPWDD's work, De Souza's requested accommodations, and public safety is less facially obvious, and strikes the Court as an issue of fact better suited for resolution on summary judgment or trial.

### E.  CSEA's Liability

Finally, De Souza brings a failure to accommodate claim against CSEA for declining to waive the seniority provisions of the CBA to permit her written reasonable accommodation requests.  De Souza's theory of liability against CSEA appears to be that if granting her reasonable accommodation requests would cause OPWDD to breach the CBA, CSEA was obligated under Title VII to grant OPWDD a waiver to accommodate her on OPWDD's request.  Am. Compl. ¶¶ 6, 80.  CSEA's denial of OPWDD's requests for waivers of the CBA to accommodate De Souza is the only basis for failure-to-accommodate liability detailed in the Amended Complaint.  *Id.*

CSEA argues that it denied these requests because it did not want to "deprive its senior members of their contract rights to select their preferred schedules in order to accommodate Plaintiff—a brand new, probationary employee."  CSEA Repl. at 2.  The crux of CSEA's argument is that, under *Hardison*, "a union and employer are not required to waive contract provisions that secure seniority rights to other employees" to satisfy a union's Title VII obligations to "accommodate religious practices within reasonable limits."  *Id.* at 3.

In general, a labor union may be held liable under Title VII "if it purposefully acts or refuses to act in a manner which prevents or obstructs a reasonable accommodation by the employer so as to cause the employer to discriminate on the basis of religion."  *Chrysler Corp.*, 173 F.3d at 703–04.  As previously stated, the Court cannot yet determine whether providing De Souza her requested accommodations would constitute a breach by OPWDD of the CBA's seniority provisions, or would instead fall within their exceptions.  If De Souza's accommodation requests would cause OPWDD to breach the CBA, a waiver of the CBA by CSEA would constitute an undue burden, as a matter of law, under *Hardison*.  The few courts to consider this issue have held that while a union "could perhaps give consent to a variance if it met with the approval of its

affected members," it would constitute an undue burden to "vary the seniority provisions of the collective bargaining agreement in disregard of the contractual rights of employees who wished to be afforded the benefits of their seniority." *Huston v. Loc. No. 93, Int'l Union, United Auto., Aerospace & Agrc. Implement Workers of Am.*, 559 F.2d 477, 480 (8th Cir. 1977); *see also Cook v. Chrysler Corp.*, 779 F. Supp. 1016, 1023 (E.D. Mo. 1991) (same); *Nottelson v. Smith Steel Workers D.A.L.U. 19806*, 643 F.2d 445, 451 (7th Cir. 1981) (noting, in dicta, that Title VII provides an exemption for unions "for unintentional discrimination resulting from the implementation of a bona fide seniority . . . system" under *Hardison*). Given *Hardison*'s clear holding, it would be "anomalous to require a union to do that which is not required of the employer: modify seniority rules in derogation of the contractual rights of its members." *Huston*, 559 F. 2d at 481.[10]

If De Souza's requested accommodations would not cause OPWDD to breach the CBA, however, OPWDD would not require a waiver from CSEA to grant them. De Souza has plead that her accommodations were denied by OPWDD in part because CSEA "would not waive the seniority provisions." Am. Compl. ¶ 77; *see id.* ¶¶ 104, 107. At this stage, viewing these allegations in the light most favorable to De Souza, they are sufficient to establish that CSEA's refusal of the accommodation requests "prevent[ed] or obstruct[ed] a reasonable accommodation by the employer." *Chrysler Corp.*, 173 F.3d at 703–04. Although there is "little caselaw" construing a union's liability in this context, courts have found a union to be liable where it "prevent[ed] an employer from fulfilling its statutory responsibilities" under Title VII. *Local 556*,

---

[10] *Hardison* itself explicitly declined to reach the question of whether a union is "legally obligated to waive or vary provisions of their collective bargaining agreement in order to accommodate" a member's religious beliefs, "if called upon by [the employer] to do so" because the union in that case was a prevailing party below. *Hardison*, 432 U.S. at 70 n.5. Nevertheless, *Hardison*'s logic, though focused on an employer's obligations under Title VII, appears equally applicable to unions.

156 F.4th at 490. CSEA's denial of De Souza's waiver requests may well have "prevent[ed] or obstruct[ed]" OPWDD from providing her a reasonable accommodation to which she was entitled under Title VII. *Chrysler Corp.*, 173 F.3d at 703.

For these reasons, De Souza has adequately pleaded a Title VII failure-to-accommodate claim against both the Institutional Defendants and CSEA.

## II.      Discrimination Under Title VII—Disparate Treatment

De Souza also brings a disparate-treatment claim against the Institutional Defendants and CSEA. "[I]n an employment discrimination case, a plaintiff must plausibly allege that (1) the employer took adverse action against him, and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 86 (2d Cir. 2015). Here, the parties agree that the first prong is satisfied because De Souza was terminated from her employment. *See Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004); NYS Mot. at 21. The parties dispute, however, whether De Souza has adequately alleged that her religion was a "substantial or motivating factor contributing to" OPWDD's decision to terminate her. *Vega*, 801 F.3d at 85. At the pleading stage, a plaintiff can meet her burden to do so "by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination," including by assembling "bits and pieces of evidence that together give rise to an inference of discrimination." *Id.* at 87. A plaintiff may do so, for example, by alleging "the employer's criticism of the plaintiff's performance in . . . degrading terms; or its invidious comments about others in the employee's protected group . . . or the sequence of events leading to the plaintiff's discharge." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015). Ultimately, a plaintiff need only allege facts which "give plausible support to a minimal inference of discriminatory motivation." *Id.* at 311.

23

### A.  Institutional Defendants' Liability

De Souza points to three pieces of evidence which she says form a "mosaic of intentional discrimination" on behalf of the Institutional Defendants.  Pl. Opp'n at 23 (quoting *Vega*, 801 F.3d at 86).

First, De Souza alleges that her supervisor, Defendant Meadows, made disparaging remarks about her religion.  She "sarcastically suggested that Ms. De Souza find another job that would give her weekends off," and stated specifically that she "needs to choose" between her religious obligations and her work "because you cannot serve two masters as the Bible states," which De Souza understood to mean that she "was too religious to work at OPWDD."  Am. Compl. ¶¶ 98–99.  Meadows allegedly made her remarks after De Souza asked her why she would no longer approve De Souza's voluntary shift swaps.  *Id.* ¶ 98.

The New York State Defendants argue that Meadows's remark was not actually disparaging.  Oral Arg. Tr. at 7:19–21.  Because, on this motion, the Court must draw all reasonable inferences in De Souza's favor, the Court will proceed on the assumption that the content of this statement could be understood to disparage Sabbath observers.  The New York State Defendants also argue that the Amended Complaint shows that Meadows "was not in a decision-making role," and does not allege that she "participated in the ultimate decision" to terminate De Souza.  NYS Repl. at 10 n.3.  "A Title VII plaintiff can succeed on a discrimination claim against an employer even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the decision-making process."  *Naumovski v. Norris*, 934 F.3d 200, 220 (2d Cir. 2019).  Here, while Meadows was involved in approving De Souza's voluntary shift swaps, Am. Compl. ¶ 97, De Souza does not allege that Meadows was involved in any decision to terminate her.  *See* Am. Compl. ¶ 112.

24

Furthermore, even if Meadows were involved in De Souza's termination, the Second Circuit has held that "stray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination" on a disparate-treatment theory, *Naumovski*, 934 F.3d at 216, where "other indicia of discrimination" are not presented. *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998). Remarks are not "stray," and therefore are more probative of discrimination, where they are "sufficiently repetitive and severe so as to prove sufficient evidence of discriminatory intent." *Naumovski*, 934 F.3d at 216 n.47.[11] The Second Circuit has found this to be the case where the remarks "were (1) made repeatedly, (2) drew a direct link between . . . stereotypes and the adverse employment decision, and (3) were made by supervisors who played a substantial role in the decision to terminate." *Id.* (quoting *Back v. Hastings On Hudson Free Sch. Dist.*, 365 F.3d 107, 124 n.12 (2d Cir. 2004)); *see, e.g.*, *Carey v. N.Y.S. Dep't of Health*, 2025 WL 2732918, at *9 (S.D.N.Y. Sept. 25, 2025) (applying this test).[12] De Souza has not plausibly alleged that all of these factors are present, which leads the Court to conclude that Meadows's statement would not establish an inference of discrimination. Meadows's remarks, though linked to her decision to deny De Souza an accommodation, were made one time by an individual not alleged to be involved in De Souza's termination. Furthermore, even if the statement that De Souza should "find another job that gives her weekends off," Am.

---

[11] The Second Circuit has further made clear that the categorization of a remark as "stray" is "an attempt . . . to explain that the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). When the Circuit has described remarks as "stray," "the purpose of doing so was to recognize that all comments pertaining to a protected class are not equally probative of discrimination and to explain in generalized terms why the evidence in the particular case was not sufficient." *Id.* at 115–16.

[12] The Second Circuit has also articulated this framework as a substantially similar four-factor test, assessing: "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 112 (2d Cir. 2019); *see, e.g.*, *Santiago v. ACACIA Network, Inc.*, 634 F. Supp. 3d 143, 153 (S.D.N.Y. 2022) (applying this test). The Court's conclusion would be the same under this framework as well.

Compl. ¶ 98, is linked to De Souza's termination for absenteeism, it is a "remote" and "oblique" connection at best. *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). The Amended Complaint's allegations regarding Meadows's statement are, therefore, insufficient to support a disparate-treatment claim.

Second, De Souza relies on a comparator theory of causation by arguing that OPWDD allowed similarly-situated employees to adjust their work schedules for non-religious reasons. "To establish an inference of discrimination, a plaintiff must allege that she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014). An employee is similarly situated to other employees if they were (1) "subject to the same performance evaluation and discipline standards" and (2) "engaged in comparable conduct." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000).

De Souza does not rest this allegation, however, on much more than speculation. De Souza rests on the bare allegation that OPWDD has stated that "employees are permitted to make work adjustments when approved by a supervisor." Am. Compl. ¶ 96. De Souza also makes the probabilistic argument that "it is reasonable to infer from the facts alleged about the large number of direct support assistants" in East New York alone that "there are hundreds of additional direct support assistants working in the same role as Ms. De Souza throughout the state." Pl. Opp'n at 27. Because the Amended Complaint alleges that OPWDD has "a practice of making non-religious work adjustments," the argument goes, it is "a reasonable inference" that "there are direct support assistants, who are similarly situated to Ms. De Souza, who received work adjustments for non-religious reasons." *Id.*

26

This argument is unpersuasive.  De Souza alleged, "on information and belief," that the New York State Defendants "adjust[ed] work schedules of other employees for non-religious reasons."  Am. Compl. ¶¶ 73–74.  But she has not identified any particular, allegedly similarly-situated employee who requested and received an adjustment to their work schedule.  Courts in this Circuit have held that a plaintiff seeking to establish an inference of discrimination through the treatment of similarly-situated employees must identify particular similarly-situated employees who were treated more favorably and allege facts to show that they are similarly-situated.  *See, e.g.*, *Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89, 115 (S.D.N.Y. 2022) ("[Plaintiff] must actually identify a similarly situated employee; vague references to 'comparable White supervisors' are not sufficient."); *Senese v. Longwood Cent. School Dist.*, 330 F. Supp. 3d 745, 768 (E.D.N.Y. 2018) (collecting cases and determining that the plaintiff's "failure to identify a similarly situated employee . . . precludes an inference of discrimination"); *Paupaw-Myrie v. Mt. Vernon City Sch. Dist.*, 653 F. Supp. 3d 80, 99 (S.D.N.Y. 2023) ("[A] Title VII plaintiff must still identify at least one comparator to support a minimal inference of discrimination; otherwise the motion to dismiss stage would be too easy to bypass.").[13]

De Souza argues that she should not be required to identify specific similarly-situated employees who received accommodations because she "only worked for defendant OPWDD for approximately 9 months," while acknowledging that she has alleged that "approximately 27 employees . . . were in the same direct support assistant role as Ms. De Souza in the facility where she worked."  Pl. Opp'n at 27.  But it is De Souza's burden to allege that any one of these allegedly

---

[13] De Souza primarily relies on this Court's decisions in *Sughrim* and *Takluder* to argue that she has properly plead a comparator theory of causation.  Unlike De Souza, however, the plaintiffs in those cases alleged that specific similarly-situated employees were treated more favorably, rather than relying on bare speculation.  *Sughrim v. New York*, 503 F. Supp. 3d 68, 97 (S.D.N.Y. 2020); *Talukder v. New York*, 2023 WL 2752863, at *8 (S.D.N.Y. Mar. 31, 2023).

similarly-situated employees received adjustments to their work schedules for non-religious reasons.

Third, De Souza alleges that the sequence of events leading up to her termination "creates an inference of discrimination." *Id.* at 27. Here, though, she simply alleges that OPWDD terminated her employment "after she missed daytime Saturday shifts due to her Sabbath." *Id.* at 28; *see* Am. Compl. ¶ 113 ("The stated reason for Ms. De Souza's termination was 'frequent call-outs.' However, these 'call-outs' were exclusively for the purpose of observing her [S]abbath after OPWDD refused to provide reasonable accommodation for her religious beliefs and practices."). De Souza makes no allegation that her termination was pretextual, though, and the Court is not persuaded that a termination for frequent call-outs creates an inference of discrimination.

For these reasons, then, the Court holds that De Souza has not met her burden of alleging an inference of discrimination against her by the Institutional Defendants. Accordingly, her disparate-treatment claim against them must be dismissed.

### B. CSEA's Liability

De Souza next brings a disparate-treatment claim against CSEA, suggesting that it has liability under Title VII because it intentionally declined to waive the seniority provisions in the CBA for discriminatory reasons. Pl. Opp'n at 28.[14] De Souza rests this claim entirely on the alleged inference that "the union has in the past waived seniority provisions to make work adjustments for non-religious reasons," based on her conversation with Arnett, the CSEA vice-president, in which he allegedly stated that employees have a right to 60 days of work adjustments under the CBA. *Id.*; Am. Compl. ¶ 109.

---

[14] De Souza's theory of CSEA's liability is somewhat confused, arguing at points that CSEA has liability under Title VII because it "failed to take action that [was] available to it to challenge" the New York State Defendants' alleged discrimination, but also that it had a "discriminatory motive" itself in refusing to waive the CBA's seniority provisions. Pl. Opp'n at 22, 28.

CSEA raises a number of issues with De Souza's disparate-treatment claim against it, arguing that De Souza has neither established that CSEA took any adverse action against her nor that it acted with discriminatory intent.  The Court takes De Souza to be attempting to establish an inference of CSEA's discriminatory intent from its treatment of similarly-situated union members with respect to waiving provisions of the CBA.  As with the claims against the New York State Defendants, De Souza has failed to identify any similarly-situated union members for whom CSEA agreed to waive the CBA's seniority provisions.  Accordingly, her Title VII disparate-treatment claim against CSEA must be dismissed.

### III.   Discrimination Under Title VII—Retaliation

De Souza also brings a claim against the Institutional Defendants for retaliation in violation of Title VII, namely, that she was terminated in retaliation for her reasonable accommodation requests and her administrative complaint with the NYSDHR.  To survive a motion to dismiss, De Souza must "present evidence that shows (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn*, 795 F.3d at 316.  Once the initial burden is met, "a presumption of retaliation" arises, which the employer "may rebut by articulating a legitimate, non-retaliatory reason for the adverse employment action." *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015).  "If the employer provides such a reason, the presumption of retaliation dissipates, and the burden shifts back to the plaintiff to prove that the desire to retaliate was the but-for cause of the challenged employment action." *Pagan v. Rsch. Found. of City Univ. of N.Y.*, 2025 WL 2793685, at *6 (S.D.N.Y. Oct. 1, 2025).

The New York State Defendants only dispute that the first and fourth elements are satisfied: that religious accommodation requests do not constitute a protected activity and that there is no causal connection between De Souza's protected activity and her termination. The Court considers them in turn, concluding that De Souza has failed to plausibly allege a causal connection to support a *prima facie* Title VII retaliation claim.

## A. Protected Activity

First, the New York State Defendants assert that De Souza's reasonable accommodation requests do not constitute protected activity under Title VII. The Second Circuit has not yet decided whether "a request for a religious accommodation constitutes protected activity under Title VII, but district courts in this [C]ircuit have held that it does. Indeed, this Court has as well." *Pagan*, 2025 WL 2793685, at *7 (Abrams, J.); *see Jeffrey v. Montefiore Med. Ctr.*, 2013 WL 5434635, at *23 (S.D.N.Y. Sept. 27, 2013) (Abrams, J.).

Defendants base their argument on holdings by New York State courts that a request for a religious accommodation is not a protected activity under the New York State Human Rights Law. *See Medina v. AAM 15 Mgmt. LLC*, 750 F. Supp. 3d 332, 345–46 (S.D.N.Y. 2024) (collecting cases). But, in reaching its conclusion that such requests are protected activity under Title VII, this Court has been "guided by the rule of this Circuit, applied to claims of retaliation under the Americans with Disabilities Act, . . . that requests for disability accommodations are protected activity." *Pagan*, 2025 WL 2793685, at *7 n.4 (collecting cases). And, because the Second Circuit has instructed that the framework for analyzing Title VII retaliation claims is the same as that for ADA retaliation claims, *see Muller v. Costello*, 187 F.3d 298, 311 (2d Cir. 1999), this Court has held, and holds again here, that religious accommodation claims constitute protected activity for purposes of a Title VII retaliation claim.

30

### B.  Causal Connection

To state a retaliation claim under Title VII, De Souza must allege that her protected activity "was the but-for cause of the adverse employment action."  *Ninying v. N.Y.C. Fire Dep't*, 807 F. App'x 112, 115 (2d Cir. 2020) (summary order).  In this context, but-for causation "requires only that absent the retaliatory motive, the adverse action would not have occurred," rather than "proof that retaliation was the only cause of the employer's action."  *Farmer v. Shake Shack Ents., LLC*, 473 F. Supp. 3d 309, 333 (S.D.N.Y. 2020).  "Proof of a causal connection can be established directly through evidence of retaliatory animus directed against a plaintiff, or indirectly by showing that the protected activity was followed closely by discriminatory treatment or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct."  *Barney v. Consol. Edison Co. of N.Y.*, 2009 WL 6551494, at *11 (E.D.N.Y. Oct. 1, 2009) (citing *Terry v. Ashcroft*, 336 F.3d 128, 152 (2d Cir. 2003)).

The New York State Defendants argue that (1) "Plaintiff has not alleged any facts that would indicate that retaliatory intent led to her termination," and (2) the timing of De Souza's termination precludes a finding of causation.  NYS Mot. at 24–26.  The Court agrees with both arguments.

First, De Souza has not plausibly alleged facial retaliatory intent.  As previously discussed, she asserts that she was terminated for her "frequent call-outs," which were "exclusively for the purpose of observing her [S]abbath after OPWDD refused to provide reasonable accommodation for her religious beliefs and practices."  Am. Compl. ¶ 113.  She also includes a bare allegation that she was terminated "in retaliation for seeking religious accommodation and filing a charge with the NYSDHR."  *Id.* ¶ 114.  De Souza argues, therefore, that "[w]hen defendants fired Ms. De Souza for frequent call-outs, they fired her because of her religious practice."  Pl. Opp'n at 29.

31

But that doesn't follow. As alleged, the New York State Defendants stated that they terminated De Souza for missing work. Am. Compl. ¶ 113. The Court does not find it plausible, as De Souza argues, that a termination for frequently missing work to observe the Sabbath, without authorization, gives rise to an inference of retaliatory intent, particularly where De Souza has not alleged that the stated reason for her termination was pretextual. *See Livingston v. City of New York*, 563 F. Supp. 3d 201, 249 (S.D.N.Y. 2021) (holding that absenteeism was a non-retaliatory reason to terminate an employee who frequently missed work, without approval, to observe the Sabbath); *Jean-Pierre v. Naples Cmty. Hosp.*, 817 F. App'x 822, 829–30 (11th Cir. 2020) (same).

Second, De Souza alleges that the timing of her termination—five months after filing her initial complaint with NYSDHR—establishes a causal relationship. A plaintiff in the Second Circuit can raise an inference of retaliatory intent "by showing that the protected activity was closely followed in time by the adverse employment action." *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001). There is no "bright line . . . defin[ing] the outer limits beyond which a temporal relationship is too attenuated to establish" causation. Nevertheless, the Supreme Court has cautioned that "the cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *see Sealy v. State Univ. of N.Y.*, 834 F. App'x 611, 614 (2d Cir. 2020) (summary order) (similar). A court may "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013).

32

In *Gorman-Bakos v. Cornell Cooperative Extension of Schenectady County*, on which De Souza relies, the Second Circuit considered instances of protected activity over a five-month period, and where the final instance of activity preceded the first alleged instance of retaliation by "only a few days." *Gorman-Bakos*, 252 F.3d at 555. In this posture, the Second Circuit held that "five months" between the first instance of activity and the alleged retaliation "is not too long" to support an allegation of retaliation. *Id.* Other courts in this District have held that "lapses of time shorter than even three months" between the protected activity and alleged retaliation "are insufficient to support an inference of causation." *Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 503 (S.D.N.Y. 2010) (collecting cases). In a recent opinion, the Second Circuit similarly stated that, "in the absence of other factual allegations supporting causation," a plaintiff must "usually" allege a gap of "less than three or four months." *Gehlaut v. N.Y.C. Dep't of Educ.*, 2025 WL 2586770, at *2 (2d Cir. Sept. 8, 2025) (summary order).

De Souza's attempt to establish causation through temporal proximity fails. Her first instance of protected activity—seeking a formal, written accommodation from OPWDD on September 18, 2023—occurred approximately eight months before her termination, and one month after she was hired. Am. Compl. ¶ 56. De Souza's last alleged instance of protected activity, when she filed a complaint with the NYSDHR, occurred on January 8, 2024, more than four months before May 16, 2024, when she was informed that she would be terminated. *Id.* ¶¶ 111–12.

As previously noted, De Souza has alleged only bare facts surrounding her termination, and has not alleged that the one individual she claims to have made discriminatory comments towards her—her supervisor, Defendant Meadows—was in any way involved in her termination. The four-month gap between her last instance of protected activity, put in the context of the several instances of protected activity which preceded it, over the course of several months, is therefore

33

insufficient, standing alone, to establish causality for her retaliation claim.  Many of the cases in which a longer gap was found to be sufficient to establish causation relied on factors which were not present here, like, for example, a finding that "the adverse action occurred at the first actual opportunity to retaliate." *Summa*, 708 F.3d at 128–29; *see also Espinal v. Goord*, 558 F.3d 119, 129–130 (2d Cir. 2009); *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 785 (S.D.N.Y. 2019) (finding an eight-month gap to be sufficient where the plaintiff alleged "a pattern of conduct and relationships that indirectly support an underlying retaliatory motivation").

For these reasons, the Court finds that De Souza has failed to meet her burden to plausibly allege a Title VII retaliation claim.  Her claim is thus dismissed.

## IV.    State Law Claims

The Court turns next to De Souza's claims under the NYCHRL and NYSHRL against the Individual Defendants.

### A. Individual Liability Under the NYSHRL and NYCHRL

The Individual Defendants argue that De Souza cannot bring claims against them under the NYSHRL and NYCHRL because they were not "employers" within the meaning of the statute. NYS Mot. at 30.

#### 1.  NYSHRL

Unlike Title VII, the NYSHRL permits two theories of individual liability for reasonable accommodation and disparate-treatment claims: where the individual defendant is considered an "employer," *see* N.Y. Exec. Law § 296(1), or where the defendant "aided and abetted the unlawful discriminatory acts of others." *Xiang v. Eagle Enters., LLC*, 2020 WL 248941, at *5 (S.D.N.Y. Jan. 16, 2020); *see* N.Y. Exec. Law § 296(6).  Individual employees may be directly liable for retaliation claims under the NYSHRL.  *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d

34

349, 365–66 (S.D.N.Y. 2012); *see* N.Y. Exec. Law § 296(7) (providing that it is an "unlawful discriminatory practice for *any person* engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article" (emphasis added)).

So-called "employer" liability may lie under the NYSHRL for "individuals with ownership interests or supervisors, who themselves, have the authority to hire and fire employees." *Malena*, 886 F. Supp. 2d at 366; *see Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 57 (2d Cir. 2012) (noting that an individual is an "employer" under the NYSHRL where they have "the power to do more than carry out personnel decisions made by others"). De Souza argues that the Amended Complaint plausibly alleges that the Individual Defendants are "employers" within the meaning of the NYSHRL because they "were personally involved in rejecting [S]abbath accommodations for Ms. De Souza." Pl. Opp'n at 40. That conclusory statement, however, is insufficient, at least for direct liability under the NYSHRL. The Amended Complaint contains no allegations that any of the Individual Defendants had the authority to "hire and fire" or "do more than carry out personnel decisions made by others." *Xiang*, 2020 WL 248941, at *5–6 (rejecting employer liability against individual defendants where the plaintiff had not alleged that they had "the power to hire or fire her").

The NYSHRL's "aiding and abetting" provision makes it unlawful "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so." N.Y. Exec. Law § 296(6). "This language allow[s] a co-worker who actually participates in the conduct giving rise to a discrimination claim to be held liable under the NYSHRL even though that co-worker lacked the authority to either hire or fire the plaintiff." *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004).

The Individual Defendants argue that "when sovereign immunity bars a claim against a plaintiff's employer," because, for example, that employer is a state agency, "then individuals also cannot be held liable as aiders and abettors of that state employer's conduct." NYS Mot. at 31. As the parties note, there is a split in authority in this District as to whether aiding-and-abetting claims may be maintained against individual defendants who are employees of New York State agencies. *See id.*; Pl. Opp'n at 41. This Court has not yet had the opportunity to pass on this question, but it concludes that such claims may proceed, and are not barred by sovereign immunity.

The Second Circuit has not "squarely" addressed this question, but it has previously "analyzed a state employee's individual liability under the NYSHRL on the merits, rather than dismissing the claim even when any claim against the state employer would have been barred by sovereign immunity." *Okafor v. N.Y.S. Ins. Fund*, 2025 WL 2299172, at *12 (S.D.N.Y. Aug. 8, 2025); *see Feingold*, 366 F.3d at 149, 158. The basic contours of the issue are as follows. New York State courts have held that "the employer's participation in the discriminatory practice serves as the predicate for the imposition of liability on others for aiding and abetting." *Murphy v. ERA United Realty*, 251 A.D. 2d 469, 472 (2d Dep't 1998), *overruled on other grounds by Russell v. N.Y. Univ.*, 42 N.Y.3d 377 (2024). Some courts have interpreted this principle to stand for the proposition that the employer must be found liable for a violation of the NYSHRL as a prerequisite for individual liability. *See, e.g.*, *Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 253 (E.D.N.Y. 2015); *Ren Yuan Deng v. N.Y. State Off. of Mental Health*, 2015 WL 221046, at *5 (S.D.N.Y. Jan. 15, 2015).

Other courts have reasoned that this principle leads to the conclusion that "dismissal of the cause of action against the employer/principal warrants dismissal of the derivative, aiding and abetting cause of action *only* where the dismissal against the employer/principal was on the merits,

36

(*i.e.*, where the employer was not found to have engaged in a discriminatory practice)." *Bonaffini v. City Univ. of N.Y.*, 2021 WL 2895688, at *3 (E.D.N.Y. July 9, 2021). The Court is persuaded by the reasoning set forth by the cases adopting this holding and, therefore, joins the other courts in this Circuit holding that sovereign immunity does not bar aiding-and-abetting claims against individual defendants working for state agencies. *See, e.g.*, *Carey*, 2025 WL 2732918, at *15; *Bonaffini*, 2021 WL 2895688, at *3; *Okafor*, 2025 WL 2299172, at *13; *Henry-Offor v. City Univ. of N.Y.*, 2012 WL 2317540, at *5 (S.D.N.Y. June 15, 2012). Accordingly, the Individual Defendants may be held liable for De Souza's NYSHRL reasonable-accommodation and disparate-treatment claims on aiding-and-abetting grounds, and her retaliation claim on direct grounds, if De Souza has plausibly alleged facts to establish such liability.

### 2. NYCHRL

The Individual Defendants further argue that De Souza's claims under the NYCHRL are barred because the NYCHRL only provides for liability for employers. NYS Mot. at 31. They are incorrect. The NYCHRL makes it unlawful for "an employer *or an employee or agent thereof*, because of the actual or perceived . . . creed . . . of any person . . . to discharge from employment such person; or [to] discriminate against such person." N.Y.C. Admin. Code § 8-107(1)(a) (emphasis added). The NYCHRL thus "provides a broader basis for direct individual liability than the NYSHRL," and "provides for individual liability of an employee." *Malena*, 886 F. Supp. 2d at 366; *see Banks v. Corr. Servs. Corp.*, 475 F. Supp. 2d 189, 200 (E.D.N.Y. 2007). Individual liability under the NYCHRL is limited to cases where "an individual defendant actually participates in the conduct giving rise to the plaintiff's discrimination or retaliation claim." *Malena*, 886 F. Supp. 2d at 366. Furthermore, as recently clarified by the New York Court of Appeals, a plaintiff must allege that an individual defendant had "some supervisory role over the

37

victim of their discrimination." *Russell*, 42 N.Y.3d at 389–90.  De Souza has satisfied both of these requirements here.

### B. Sovereign Immunity

De Souza brings a claim for injunctive relief under the NYSHRL and NYCHRL to enjoin the Individual Defendants from violating these laws' "prohibition on employment practices that cause or allow to persist religious discrimination and retaliation" and to "make reasonable accommodations for the sincere religious beliefs of [S]abbath observers."  Am. Compl. ¶ 153. These Defendants are sued in both their official and individual capacities.  The parties appear to agree that sovereign immunity bars such injunctive relief, predicated on state and city law, as to the Individual Defendants acting in their official capacities.  NYS Mot. at 29–30; Pl. Opp'n at 37– 38; *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 90 (1984); *Soloviev*, 104 F. Supp. 3d at 245.

De Souza alleges, however, that the Individual Defendants were acting in their individual capacities when they "exercised discretion under the CBA to determine whether to grant religious accommodations or apply exceptions favorable to . . . De Souza."  Pl. Opp'n at 38.  De Souza does not argue why this is so, or why these Defendants would be permitted to exercise any such authority in their individual capacities; indeed, any power they possess to grant De Souza employment accommodations, or terminate her employment, springs directly from their positions within OPWDD.  Clearly, "Defendants would not have the authority to provide such relief in their individual capacities."  *Kuck v. Danaher*, 822 F. Supp. 2d 109, 143 (D. Conn. 2011); *see also Smith v. Plati*, 56 F. Supp. 2d 1195, 1203 (D. Colo. 1999).[15]  Accordingly, De Souza's claims

---

[15] De Souza cites cases, ostensibly in support of the proposition that an official acts in their personal capacity when they exercise discretion, which are entirely inapposite.  Pl. Opp'n at 38.  In both *Kuck v. Danaher* and *Loren v. Leavy*, the court was asked to consider whether to grant an injunction against a state official, acting in their official capacity, pursuant to a Section 1983 claim under federal law.  *Kuck*, 822 F. Supp. 2d at 141–143; *Loren v. Leavy*, 2003 WL

against the Individual Defendants pursuant to the NYSHRL and NYCHRL, to the extent they seek prospective injunctive relief, are dismissed without prejudice.

## C. Reasonable Accommodation

Moving to the substantive portions of De Souza's claims under the NYSHRL and NYCHRL, the Court begins with De Souza's reasonable-accommodation claims. The NYSHRL provides that:

> [i]t shall be an unlawful discriminatory practice for any employer, or an employee or agent thereof, to impose upon a person as a condition of obtaining or retaining employment, including opportunities for promotion, advancement or transfers, any terms or conditions that would require such person to violate or forego a sincerely held practice of his or her religion, including but not limited to the observance of any particular day or days or any portion thereof as a sabbath or other holy day in accordance with the requirements of his or her religion or the wearing of any attire, clothing, or facial hair in accordance with the requirements of his or her religion, unless, after engaging in a bona fide effort, the employer demonstrates that it is unable to reasonably accommodate the employee's or prospective employee's sincerely held religious observance or practice without undue hardship on the conduct of the employer's business.

N.Y. Exec. L. § 296(10)(a). Courts generally view the standards governing reasonable-accommodation claims under Title VII and the NYSHRL to be "analytically identical" and therefore apply "the same standard of proof to both claims." *Algarin*, 678 F. Supp. 3d at 507; *see Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 n.7 (2d Cir. 2019).[16] Notably, an "undue hardship" is

---

1702004, at \*11 (S.D.N.Y. March 31, 2003). She cites no cases that actually support her proposition, and the Court is aware of none.

[16] The Court is aware of at least one important difference. When an employer is faced with an accommodation request that may violate a collective bargaining agreement, the NYSHRL creates an additional duty on behalf of the employer to work with the union to reach a solution. In *New York City Transit Authority*, the plaintiff sought a religious accommodation from mail delivery work during the Sabbath, and the New York Court of Appeals held that an employer had a duty, where a union reasonably maintains that a requested accommodation would violate a collective bargaining agreement, to "take reasonable steps short of . . . labor litigation in an effort to reach an accommodation" of the plaintiff's needs. *N.Y.C. Transit Auth. v. State of N.Y., Exec. Dep't Div. of Hum. Rts.*, 89 N.Y.2d 79, 89 (1996). An employer could, for example, "approach[] the union in an effort either to negotiate an over-all plan to accommodate Sabbath observers or to secure a specific waiver of seniority rules for" the plaintiff "individually." *Id.* Here, Defendant Wilson, the Deputy Director of State Operations, reached out to CSEA to "seek a waiver of the collective bargaining agreement so that OPWDD could offer an accommodation" to De Souza "outside the seniority-based bidding process." Am. Compl. ¶ 76. This effort to "secure a specific waiver of seniority rules" for De Souza from CSEA appears to satisfy whatever obligation existed under the NYSHRL to work with CSEA to accommodate her, and De Souza does

defined in the statute as "an accommodation requiring significant expense or difficulty (including a significant interference with the safe or efficient operation of the workplace or a violation of a bona fide seniority system)." N.Y. Exec. L. § 296(10)(d)(1). The standards applicable to an undue hardship defense under the NYSHRL are therefore substantially the same as the standards applicable to a parallel Title VII claim as construed by *Hardison* and *Groff*, namely, that an employer must show "significant" or "substantial" expense or difficulty to establish undue hardship, but that the violation of a contractual seniority system constitutes an undue hardship as a matter of law. Because the Court has concluded that De Souza has stated a failure to accommodate claim under Title VII, it concludes that she has done so under the NYSHRL.

The NYCHRL prohibits discrimination based on the actual or perceived "creed" of any person. N.Y.C. Admin. Code § 8-107(1). It further states that:

> [i]t shall be an unlawful discriminatory practice for an employer . . . to impose upon a person as a condition of obtaining or retaining employment any terms or conditions, compliance with which would require such person to violate, or forego a practice of, such person's creed or religion . . . and the employer shall make reasonable accommodation to the religious needs of such person.

*Id.* § 8-107(3)(a). A reasonable accommodation under the NYCHRL is "accommodation to an employee's . . . religious observance or practice" that does not cause an "undue hardship" to the employer. *Id.* § 8-107(3)(b). "Undue hardship" is defined as "accommodation requiring significant expense or difficulty," including "significant interference with the safe or efficient operation of the workplace." *Id.* The same analytical framework governs NYCHRL claims as Title VII and NYSHRL claims. *Algarin*, 678 F. Supp. 3d at 512. Because NYCHRL claims must be construed "more liberally" than Title VII claims, and "broadly in favor of discrimination plaintiffs," and because the Court, similarly, has concluded that De Souza has stated a failure to

not appear to argue otherwise. *N.Y.C. Transit Auth.*, 89 N.Y.2d at 89.

40

accommodate claim under Title VII, it concludes that she has also stated such a claim under the NYCHRL. *Owens v. City of N.Y. Dep't of Educ.*, 2022 WL 17844279, at *2 (2d Cir. Dec. 22, 2022) (summary order); *see Mihalik v. Credit Agricole Chevreux N. Am. Inc.*, 715 F.3d 102, 109, 113 (2d Cir. 2013).

### D. Disparate Treatment

The Court next examines De Souza's disparate-treatment claims under the NYSHRL and NYCHRL. As previously noted, "Courts must analyze NYCHRL claims separately from any federal law claims and should construe the NYCHRL liberally for the accomplishment of the uniquely broad and remedial purposes thereof." *Bueno v. Eurostars Hotel Co., S.L.*, 2022 WL 95026, at *8 (S.D.N.Y. Jan. 10, 2022). In 2019, the NYSHRL was amended to direct courts to construe it, like the NYCHRL, "liberally for the accomplishment of the remedial purposes thereof." Following these amendments to the NYSHRL, to bring a disparate-treatment claim under either the NYSHRL or NYCHRL, a plaintiff "need only show differential treatment—that she is treated less well—because of a discriminatory intent." *Mihalik*, 715 F.3d at 110; *see Mumin v. City of New York*, 760 F. Supp. 3d 28, 52–53 (S.D.N.Y. 2024). These statutes are not, however, "general civility code[s];" "the plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive." *Mihalik*, 715 F.3d at 110.

The more liberal construction afforded to disparate-treatment claims under the NYCHRL and NYSHRL, however, "does not cure [De Souza's] failure to identify a similarly-situated comparator." *Hamilton v. City of New York*, 563 F. Supp. 3d 42, 59 (E.D.N.Y. 2021); *see Greenbaum v. N.Y.C. Transit Auth.*, 2021 WL 2650509, at *6 (S.D.N.Y. June 25, 2021), *rev'd in part on other grounds*, 2022 WL 3347893 (2d Cir. Aug. 15, 2022) (summary order). As discussed above, De Souza has not pled that an individual who expressed any bias towards her played a role

41

in her termination.  Furthermore, because she "has not identified any similarly situated [OPWDD] employees, she has not met her burden to plead circumstances that would permit the Court to conclude that she experienced differential treatment compared to similarly situated employees." *Mumin*, 760 F. Supp. 3d at 52–53.  Accordingly, her disparate-treatment claims under the NYSHRL and NYCHRL must be dismissed.

### E.  Retaliation

Finally, the Court examines De Souza's retaliation claims under the NYSHRL and NYCHRL.  The NYSHRL makes it unlawful for an employer to retaliate or discriminate against an employee because she has "opposed any practices forbidden under this article or because . . . [she] has filed a complaint, testified or assisted in any proceeding under this title." N.Y. Exec. Law § 296(7).  Similar standards govern retaliation claims under Title VII and the NYSHRL.  *See Farmer*, 473 F. Supp. 3d at 330; *see Hatzimihalis v. SMBC Nikko Secs. Am., Inc.*, 2023 WL 3764823, at *13 (S.D.N.Y. June 1, 2023) (noting the "substantively identical standard" to make out a *prima facie* case for Title VII retaliation claims and NYSHRL claims).  There is, however, one notable difference:  under the NYSHRL, unlike Title VII, "a request for reasonable accommodation is not a protected activity for purposes of a retaliation claim."  *Guerrero v. Constellation Health Servs.*, 2025 WL 2549936, at *15 (E.D.N.Y. Sept. 4, 2025) (citing *Witchard v. Montefiore Med Ctr.*, 103 A.D.3d 596, 596–97 (1st Dep't 2013)).  Nevertheless, because the Court has concluded that De Souza has not properly pled a retaliation claim under Title VII, she has not done so under the NYSHRL.

"Under the NYCHRL, the retaliation inquiry is broader than its federal and state counterparts." *Deveaux v. Skechers USA, Inc.*, 2020 WL 1812741, at *7 (S.D.N.Y. Apr. 9, 2020). The NYCHRL prohibits "retaliation in any manner," and "the retaliation need not result in an

ultimate action with respect to employment . . . or in a materially adverse change in the terms and conditions of employment." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 723 (2d Cir. 2010) (citing N.Y.C. Admin. Code § 8-107(7)); *see Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 76–77 (2d Cir. 2015) (noting that the NYCHRL protects "plaintiffs who oppose any practice forbidden under the law from conduct reasonably likely to deter a person engaging in such action").

As courts have observed, the NYCHRL has a less-stringent causation requirement for a *prima facie* case than Title VII.  Title VII requires that a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).  By contrast, under the NYCHRL, a plaintiff need only show that an adverse employment action was "caused at least in part by retaliatory motives." *Ya-Chen Chen*, 805 F.3d at 76; *see Hatzimihalis*, 2023 WL 3764823, at *13 & n.17 (explaining this difference).  Despite this loosened causation requirement, De Souza must still demonstrate a "causal link" between the protected activity and the retaliatory act. *Alexander v. Possible Prods., Inc.*, 336 F. Supp. 3d 187, 196 (S.D.N.Y. 2018); *see Gachette v. Metro N.-High Bridge*, 722 F. App'x 17, 21 (2d Cir. 2018) (summary order) (same).

De Souza has not plausibly alleged that her termination was "motivated, in part, by retaliation." *Ya-Chen Chen*, 805 F.3d at 77.  As pled, and as discussed above, the time gap between De Souza's protected activity and her termination is simply too long to support such a finding, given the circumstances alleged in the Amended Complaint, even under the standards applicable to a NYCHRL claim.  In *Philip v. Gtech Corp.*, for example, the court found that that four months between the first instance of protected activity and retaliation to be "not too attenuated" for purposes of a NYCHRL retaliation claim, whereas here, De Souza has alleged an eight-month gap

between her first instance of protected activity and her termination.  2016 WL 3959729, at \*19 (S.D.N.Y. July 20, 2016); *cf. Gachette*, 722 F. App'x at 21 (finding a gap of one year between an instance of protected activity and dismissal to be too long to demonstrate a causal link for a NYCHRL retaliation claim); *Brown v. City of New York*, 622 F. App'x 19, 20 (2d Cir. 2015) (summary order) (affirming dismissal of an NYCHRL retaliation claim where the "time lapse between [the plaintiff's] protected activities and the alleged retaliatory acts" ranged "from two months to several years").  Additionally, courts considering causality in NYCHRL retaliation claims also consider factors such as how other, similarly-situated employees who did not engage in protected activity were treated. *See Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 72 (1st Dep't 2009).  Here, again, De Souza has provided the Court with no comparators from which such an assessment may be made.

Viewing the allegations in the Amended Complaint in the light most favorable to De Souza, and as discussed above, she has alleged facts to demonstrate only that her employment was terminated after repeatedly calling out of work on the Sabbath. Am. Compl. ¶¶ 112–14.  This is insufficient to allege that retaliation was a "motivating factor" behind her termination. *McHenry v. Fox News Network*, 510 F. Supp. 3d 51, 72 (S.D.N.Y. Dec. 18, 2020).  Accordingly, De Souza's NYCHRL and NYSHRL retaliation claims will be dismissed.

## V.    Section 1983

Next, the Individual Defendants move to dismiss De Souza's Section 1983 claims against those Defendants.  This motion is denied.

### A. Free Exercise Claim

De Souza bases her Section 1983 claim on an alleged violation of her First Amendment right to the free exercise of religion, made applicable to New York by the Fourteenth Amendment.

44

*See New Yorkers for Religious Liberty, Inc. v. City of New York*, 125 F.4th 319, 330 (2d Cir. 2025). She contends that the seniority provisions of the CBA, as enforced by the Individual Defendants, burdened this right. Am. Compl. ¶¶ 132–39.

In general, where a law or policy is neutral and generally applicable, its burden on religion is constitutional if it passes rational basis review, where the government must show that it addresses a legitimate government interest rationally related to achieving that goal. *Kane v. De Blasio*, 19 F.4th 152, 166 (2d Cir. 2021); *Fulton v. City of Phila.,* 593 U.S. 522, 533 (2021). If a law or policy is not neutral or generally applicable, the government must demonstrate that it satisfies strict scrutiny, meaning that it furthers "interests of the highest order by means narrowly tailored in pursuit of those interests." *Tandon v. Newsom*, 593 U.S. 61, 64–65 (2021) (per curiam); *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025) ("That [strict-scrutiny] standard requires that a law be the least restrictive means of achieving a compelling state interest").

Plaintiffs may demonstrate that a policy is not generally applicable by alleging either that (1) it forbids religious conduct while permitting "comparable" religious conduct, or (2) it creates a system of individualized exemptions through which administrators "will use their discretion to exempt individuals from complying with the law for secular reasons, but not religious reasons." *We the Patriots USA, Inc. v. Hochul ("We the Patriots I")*, 17 F.4th 266, 284–88 (2d Cir. 2021).

First, where a government policy treats "any comparable secular activity more favorably than religious exercise," strict scrutiny applies, though "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justified the regulation at issue." *Tandon*, 593 U.S. at 62. "A law is therefore not generally applicable if it is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests

45

purportedly justifying it." *We The Patriots I*, 17 F.4th at 284–85; *see Spivack v. City of Phila.*, 109 F.4th 158, 177 (3d Cir. 2024) ("When the government says that it cannot exempt religious exercise from a policy because doing so would undermine an important interest, but then exempts other groups or actions that undermine that same interest in the same way, its arbitrary distinction between religious and secular behavior raises an inference that it has targeted religious practice for distinctive treatment.").

Second, a policy provides a "mechanism for individualized exemptions," which triggers strict scrutiny, where it gives "government officials discretion to decide whether a particular individual's reasons for requesting exemption are meritorious." *We The Patriots USA, Inc. v. Conn. Off. of Early Childhood Dev. ("We The Patriots II")*, 76 F.4th 130, 150 (2d Cir. 2023) (quoting *Fulton*, 593 U.S. at 533). The "mere existence of an exemption procedure," however, "absent any showing that secularly motivated conduct could be impermissibly favored over religiously motivated conduct," is not a "mechanism for individualized exemptions" and thus does not trigger strict scrutiny. *We the Patriots I*, 17 F.4th 266, 288 (2d Cir. 2021); *see, e.g.*, *Kane*, 19 F.4th at 165–66. Thus, where a policy contains "objectively defined categories of exemptions" that "do not invite the government to decide which reasons for not complying with the policy are worthy of solicitude," rational basis review applies. *Kane*, 19 F.4th at 166; *see We the Patriots I*, 17 F.4th at 266 (concluding that a vaccination requirement, which permitted individual exemptions pursuant to the medical judgment of physicians and nurse practitioners, relied sufficiently on objective criteria to avoid triggering strict scrutiny).

The parties do not appear to dispute that the seniority provisions of the CBA are neutral, meaning that neither their content nor the "process" of their execution "demonstrate hostility to religion," and that these provisions otherwise do not "target or affirmatively prohibit religious

46

practices." *Miller v. McDonald*, 130 F.4th 258, 266 (2d Cir. 2025), *judgment vacated on other grounds*, 2025 WL 3506969 (U.S. Dec. 8, 2025).  Rather, De Souza argues that the seniority provisions are not generally applicable because they "invite the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533.

De Souza's allegations regarding the Individual Defendants' application of the exceptions to the CBA's seniority provisions are sufficient to trigger strict scrutiny, at least at this stage of the litigation.  She has alleged, albeit on information and belief, that OPWDD used these exceptions to "adjust work schedules of other employees for non-religious reasons," but did not exercise that same discretion to accommodate "De Souza's request to accommodate her religious practice of keeping the [S]abbath." Am. Compl. ¶¶ 71–75.  The New York State Defendants' representations of how these provisions were applied in practice, too, cut against a preliminary finding of general applicability.  Their Motion to Dismiss argued that the criteria to apply these exceptions are "undefined" and "subjective" such that they could not "possibly constrain the exercise of discretion."  NYS Mot. at 43–44.  In other words, the discretionary application of exemptions to the CBA's seniority provisions was, under this argument, entirely *ad hoc* and lacked any meaningful objective criteria.  And where a government policy is applied on an "entirely discretionary basis," as was the case in *Fulton v. City of Philadelphia*, strict scrutiny generally applies. *Rizzo v. N.Y.C. Dep't of Sanitation*, 2024 WL 3274455, at \*6 n.2 (S.D.N.Y. July 2, 2024) (discussing *Fulton*); *see, e.g.*, *Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 733 (6th Cir. 2021) (applying strict scrutiny where a decisionmaker "retain[ed] discretion to extend exemptions" to a policy "in whole or in part"); *cf. Does 1-2 v. Hochul*, 632 F. Supp. 3d 120, 142 (E.D.N.Y. 2022), *rev'd in part on other grounds*, 2024 WL 5182675 (2d Cir. Dec. 20, 2024) (summary order)

(applying rational basis review where a government policy "require[d] the application of objective standards to a clearly defined group of employees").

Accordingly, for the purposes of this motion, the Court will apply strict scrutiny to De Souza's free exercise claim under Section 1983.  The Individual Defendants have "not addressed in their papers whether the . . . [seniority] policy is narrowly tailored to serve a compelling state interest," and thus have failed to justify dismissal of these claims.  *Taylor v. City of New Haven*, 806 F. Supp. 3d 223, 252 (D. Conn. 2025); *see Kane*, 19 F.4th at 169.

### B.  Qualified Immunity

The Individual Defendants also move to dismiss the Section 1983 claims on qualified immunity grounds.   These Defendants argue that they "did not violate Plaintiff's clearly established rights under the First and Fourteenth Amendments because courts have established that an employer acting under the terms of a collective bargaining agreement may deny a request for a reasonable accommodation if such an accommodation would violate said collective bargaining agreement."  NYS Mot. at 33.

In the Second Circuit, courts "apply a two-step analysis to determine whether qualified immunity bars a plaintiff's claim."  *Tanvir v. Tanzin*, 120 F.4th 1049, 1060 (2d Cir. 2024). "[Q]ualified immunity shields a defendant-official from money damages unless the plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."  *Id.*  To determine whether qualified immunity is appropriate, courts "consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law."  *Chamberlain Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020).  Furthermore, because "qualified immunity depends on

the facts known to the official at the time of the alleged violation," defendant-officials may still be immune from damages liability, even if they violate a clearly-established right, "if reasonable persons in their position would not have understood that their conduct was within the scope of the established prohibition." *Tanvir*, 120 F.4th at 1060; *see, e.g.*, *Wiggins v. Griffin*, 86 F.4th 987, 994 (2d Cir. 2023); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").

Qualified immunity is "an affirmative defense on which the defendant officials bear the burden of proof." *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013). "A defendant presenting an immunity defense on a motion to dismiss must therefore show not only that the facts supporting the defense appear on the face of the complaint, but also that it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Brown v. Halpin*, 885 F.3d 111, 117 (2d Cir. 2018); *see Tanvir*, 120 F.4th at 1060 n.6 (2d Cir. 2024).

Due to this requirement, a "qualified immunity defense presented on a Rule 12(b)(6) motion faces a formidable hurdle, and is usually not successful." *Chamberlain*, 960 F.3d at 111; *see Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006). Indeed, the Second Circuit has recently expressed a preference for "lower courts to resolve qualified immunity defenses at the summary judgment stage," particularly where the defense is based on "undiscovered or disputed facts." *Nat'l Rifle Ass'n of Am. v. Vullo*, 144 F.4th 376, 388 n.3 (2d Cir. 2025). When a defendant raises a qualified immunity defense on a motion to dismiss, "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Bloomingburg Jewish Educ. Ctr. v.*

49

*Vill. of Bloomingburg*, 111 F. Supp. 3d 459, 493 (S.D.N.Y. 2015).

Much of the qualified immunity analysis in this case is guided by binding Second Circuit precedent. In *Genas v. State of New York Department of Correctional Services*, the Second Circuit considered a claim directly analogous to that brought by De Souza. *Id.* at 828. There, a Seventh Day Adventist brought a Section 1983 claim against the New York State Department of Corrections, alleging that State officials had burdened his free exercise rights for suspending, then terminating, his employment after he repeatedly failed to work his assigned shifts on the Sabbath. *Id.* at 828–29. As directly relevant here, the *Genas* plaintiff was also covered by a collective-bargaining agreement, with a seniority provision that dictated his shift assignments. *Id.* at 828. Applying *Employment Division v. Smith*, 494 U.S. 872 (1990), which still provides much of the operative framework for Free Exercise claims against state officials following the Supreme Court's decision in *Fulton*, *see We The Patriots II*, 76 F.4th at 144–46 (noting the continued applicability of the *Smith* framework), the *Genas* court determined that the collective bargaining agreement at issue was neutral and generally applicable, such that the individual defendants "could reasonably have believed that actions taken in accordance with this valid and generally applicable agreement would withstand a Free Exercise challenge." *Genas*, 75 F.3d at 831. Accordingly, it granted them qualified immunity.

The Court begins by considering whether De Souza has alleged the existence of a clearly-established right. De Souza urges the Court to cast the constitutional right at issue here as "[t]he right of an employee to a reasonable accommodation to keep the [S]abbath," Pl. Opp'n at 35, but, under *Genas*, that definition operates "at too abstract a level of generality." *Genas*, 75 F.3d at 831. In *Genas*, the Circuit held that the district court erred in describing the right at issue as the "right to be free from religious discrimination and an employer's duty to make reasonable

50

accommodation for religious observance." *Id.* Instead, the Circuit held that the right at issue was "a state employee's right to have his religion accommodated under the Free Exercise Clause . . . when the workplace is governed by a collective bargaining agreement," and held that the existence of such a right was "not clear." *Id.* at 833; *see id.* at 831 ("[I]t has not been established that an employer acting under the terms of a collective bargaining agreement must do more to accommodate religious preferences than is required by the agreement."). The *Genas* court went on to explicitly hold that "after *Smith*," state defendants do not "violate clearly established constitutional rights of the plaintiff by refusing to take further steps to accommodate his religion" than required by the terms of a neutral and generally applicable collective bargaining agreement. *Id.* at 833.

As is the case for the Title VII claims, then, the Individual Defendants' qualified-immunity defense turns on the proper interpretation of the CBA. For example, the Court must determine whether the CBA is neutral and generally applicable, or whether the Individual Defendants "could reasonably have believed that actions taken in accordance" with the CBA "would withstand a Free Exercise challenge." *Id.* at 831. In other words, the Court must determine whether the Individual Defendants would have reasonably believed that granting De Souza an accommodation would breach the CBA. What's more, if De Souza's requested reasonable accommodations would *not* breach the CBA's seniority provisions, because they fall into one or both of the CBA's exceptions, the Court must also determine whether De Souza's right to those accommodations was, nevertheless, clearly established. *Id.* at 833. These questions turn on "undiscovered or disputed facts" which are not suitable for resolution on a motion to dismiss. *Vullo*, 144 F.4th at 388 n.3. It is, therefore, inappropriate to resolve the Individual Defendants' qualified-immunity defense on this motion.

51

## VI.   Class Allegations

Finally, Defendants move, in the alternative, to strike the Amended Complaint's class allegations under Rule 12(f).  The motions are denied.

Under Rule 12(f), the Court may, on a motion, "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  A motion to strike class allegations is "disfavored because it requires a reviewing court to preemptively terminate the class aspects of litigation, solely on the basis of what is alleged in the complaint and before plaintiffs are entitled to complete the discovery to which they would otherwise be entitled on questions relevant to class certification."  *Chen-Oster v. Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012).  Nevertheless, a motion to strike class allegations is not procedurally premature, before a class certification motion is made, where it addresses issues "separate and apart from the issues that will be decided on a class certification motion."  *Rahman v. Smith & Wollensky Rest. Grp., Inc.*, 2008 WL 161230, at *3 (S.D.N.Y. Jan. 16, 2008).  Courts therefore consider motions to strike where, as here, the movant alleges that the "class allegations fail as a matter of law," namely, "that no discoverable facts exist that would allow the certification of the alleged class," *Berryman v. Reading Int'l, Inc.*, 763 F. Supp. 3d 596, 607 (S.D.N.Y. 2025), or where "the claims fail to state a plausible entitlement to relief on behalf of the putative class members."  *Talarico v. Port Auth. of N.Y. & N.J.*, 367 F. Supp. 3d 161, 173 (S.D.N.Y. 2019).

Defendants argue that the class allegations should be stricken because the Amended Complaint "set[s] forth only conclusory allegations about the existence of other class members."  *Borgese v. Baby Brezza Ents. LLC*, 2021 WL 634722, at *6 (S.D.N.Y. Feb. 18, 2021).  Courts in this District have stricken class allegations where "no facts" have been "alleged to support

52

[plaintiff's] conclusory allegations as to the purported members of the class." *Goldberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 1998 WL 321446, at \*9 (S.D.N.Y. June 18, 1998); *see PFT of Am., Inc. v. Tradewell, Inc.*, 1999 WL 179358, at \*1 ("[P]laintiff cites no facts from which it can be determined that there is any basis other than speculation as to whether there are other members of the class.").

De Souza clears this bar, albeit barely.  De Souza identifies one potential class member as Confidential Witness 1, who was allegedly terminated for asking for a Sabbath accommodation, and relies on an individual named as Confidential Witness 2, an employee of OPWDD, who purportedly stated that there were "several other [S]abbath keepers that did not receive accommodations" from OPWDD to observe the Sabbath.  Am. Compl. ¶¶ 119–20.  De Souza also states, solely "[o]n information and belief," that "there are more than one hundred employees of OPWDD . . . who would be members of the class." *Id.* ¶ 122; *see also* Oral Arg. Tr. at 45:10–23 (statement by counsel for De Souza that "[w]e really don't know at this point" how many members are in the putative class).  Unlike *Goldberg* and *PFT*, where the putative class allegations marshaled "no facts" to support the existence of potential class members with an entitlement to relief, the allegations from the two Confidential Witnesses provide at least some factual grounding for the class allegations. *Goldberg*, 1998 WL 321446, at \*9; *PFT of Am.*, 1999 WL 179358, at \*2.

Defendants also urge the Court to strike the class allegations because the Amended Complaint, on its face, would not support a finding of commonality or typicality.  NYS Mot. at 38–42; NYS Repl. at 15–16; CSEA Mot. at 12–14.  The Court notes that examining these issues, based only on the bare facts alleged in the Amended Complaint and without the "discovery to which [De Souza] would otherwise be entitled," is particularly disfavored, as these issues are the same as those to be decided on a motion for class certification. *Berryman*, 763 F. Supp. 3d at 607;

*see Chen-Oster*, 877 F. Supp. 2d at 117. The relevant question, at this stage, "is whether, based on the allegations in the" Amended Complaint, "it is plausible that" De Souza "will come forth with sufficient evidence at the class certification stage to demonstrate commonality" or typicality. *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 464 (S.D.N.Y. 2013).

At this stage in the litigation, De Souza need only identify "a specific employment practice that ties all of the class members' claims together." *Id.* at 463. In *Wal-Mart Stores Inc. v. Dukes*, the Supreme Court instructed that, for putative Title VII class-actions at the class certification stage, a plaintiff must identify "a general policy of discrimination." 564 U.S. 338, 353 (2011). "The operative question is whether the plaintiffs can identify a common mode of exercising discretion that pervades the entire company." *Chen-Oster v. Goldman, Sachs & Co.*, 2012 WL 205875, at *5 (S.D.N.Y. Jan. 19, 2012), *report and recommendation adopted in relevant part*, 877 F. Supp. 2d 113 (S.D.N.Y. 2012).

De Souza has met this standard, as she has "sufficiently alleged headquarters-level policies to satisfy [her] burden at the pleadings stage." *Kassman*, 925 F. Supp. 2d at 464; *see Calibuso v. Bank of Am. Corp.*, 893 F. Supp. 2d 374, 386 (E.D.N.Y. 2012). De Souza alleges, albeit in a conclusory way, that "OPWDD's claim that the collective bargaining agreement prevents it from accommodating [S]abbath keepers shows there is a widespread policy and practice within OPWDD of denying [S]abbath keepers their rights to practice their religion." Am. Compl. ¶ 7. Interpreting this phrasing in a way most favorable to De Souza, she has alleged that OPWDD has consistently followed a policy, across the organization, that granting Sabbath accommodations to Sabbath observers would violate the CBA. At this early juncture, the Court will therefore not strike De Souza's class allegations "prior to learning more" about the alleged policy, and where

54

the sufficiency of her class allegations will "depend[] in part on the outcome of discovery." *Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 515 (S.D.N.Y. 2015).

Because the Court cannot conclude that it will be "impossible" to certify a class on the basis of the allegations in the Amended Complaint, it will not strike the class allegations. *Id.*

## VII.    Leave to Amend

Finally, the Court will grant De Souza leave to amend. Rule 15 of the Federal Rules of Civil Procedure instructs courts to "freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15. The Second Circuit, too, has indicated that courts should permit plaintiffs to amend a complaint with "the benefit of a ruling" on a motion to dismiss. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 190–91 (2d Cir. 2015). Furthermore, the Court has not identified any reason why denial of leave to amend would be proper, such as futility or undue prejudice to Defendants. *See, e.g.*, *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Williams v. Citigroup Inc.*, 659 F.3d 208, 213 (2d Cir. 2011).

Accordingly, the Court grants De Souza leave to amend her claims against Defendants, so long as she has a good-faith basis to do so.

## CONCLUSION

For these reasons, the Court grants Defendants' motions to dismiss in part, and denies them in part, as summarized below:

- With respect to De Souza's reasonable accommodation claims under Title VII, the NYSHRL, and the NYCHRL, the motions to dismiss are denied.

- With respect to De Souza's disparate-treatment claims under Title VII, the NYSHRL, and the NYCHRL, the motions to dismiss are granted.

55

- With respect to De Souza's retaliation claims under Title VII, the NYSHRL, and the NYCHRL, the motions to dismiss are granted.

- With respect to De Souza's claims under the NYSHRL and NYCHRL, to the extent they seek injunctive relief, the New York State Defendants' motion to dismiss is granted.

- With respect to De Souza's Section 1983 claims against the Individual Defendants, the New York State Defendants' motion to dismiss is denied.

- The Defendants' motions to strike the class allegations in the Amended Complaint are denied.

De Souza shall have thirty (30) days from the date of this Opinion and Order to file a Second Amended Complaint, if she has a good-faith basis to do so.  Finally, CSEA's first motion to dismiss the Complaint is denied as moot.  *See* Dkt. 52.  The Clerk of Court is respectfully directed to terminate the motions pending at Dkt. 52, Dkt. 70 and Dkt. 71.

SO ORDERED.

Dated:        March 19, 2026
              New York, New York

_____
Ronnie Abrams
United States District Judge