**HARWOOD LAW PLLC**
260 Madison Avenue, 16th Floor
New York, New York 10016
tony.harwood@aharwoodlaw.com
Tel.:  212-867-6820
Fax: 212-937-3167

June 25, 2026

VIA ELECTRONIC FILING

Hon. Robyn F. Tarnofsky
United States Magistrate Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:  Suzette De Souza v. The State of New York, et al., 25-CV-1222 (RA)

Dear Judge Tarnofsky:

We represent Plaintiff in this action. We write pursuant to your order of June 15, 2026, which, among other things, granted our application to extend until today's date our time to submit a letter motion related to CSEA's responses and objections to Plaintiff's initial requests for discovery. We ask the Court to direct CSEA to conduct a reasonable, counsel-directed search for responsive electronically stored information. Below, we provide an overview of the case and describe the areas disputed between Plaintiff and CSEA regarding the proper methods for searching ESI.

**I.      Summary of the Case**

Suzette De Souza worked for OPWDD as a Direct Support Assistant (DSA) in Brooklyn, NY from August 2023 until OPWDD fired her in May 2024 because she refused to work on her Sabbath. She is a Seventh Day Adventist and holds the sincere religious belief that she must not engage in secular work from sunset on Friday until sunset on Saturday. Defendant OPWDD is an agency of the State of New York and employs over 20,000 employees. New York State has two collective bargaining agreements (CBA) with defendant Civil Service Employees Association (CSEA) which apply to OPWDD as well as other New York State agencies. Those contracts are the Institutional Services Unit (ISU) and the Operational Services Unit (OSU).

Ms. De Souza's claims are brought as an individual, and on behalf of a class encompassing all similarly situated Sabbath observers who worked for OPWDD or who sought employment with OPWDD. Her claims are common to other similarly situated employees because both collective bargaining agreements contain seniority provisions governing the allocation of pass days and shift swaps.  Defendants failed to accommodate Ms. De Souza's religious needs because they claimed her requests would violate the seniority system's provisions regarding the assignment of pass days

Hon. Robyn F. Tarnofsky
June 25, 2026
Page 2 of 8

and the posting of vacancies.  But she did not ask for pass days. She asked to change her Saturday day shift to a night shift on Saturday or Sunday.

Part of Ms. De Souza's claims hinge on exceptions within the collective bargaining agreements that granted Defendants the discretion needed to accommodate her without violating the seniority system. The agreements state that employee shifts based on seniority are "subject to the operating needs of a department or agency or component thereof, or subject to an identification of differences between employees with respect to relevant factors concerning the employee's ability to perform the required duties and responsibilities satisfactorily." (ISU Section 44.2; OSU Section 50.2). Section 44.2 gave OPWDD two ways to accommodate her Sabbath. First, as necessary for OPWDD's "operating needs." Second, as a factor affecting "the employee's ability to perform the required duties and responsibilities satisfactorily." The collective bargaining agreement also provides for the same two exceptions to the posting of vacancies.

After her first accommodation request was formally denied, Ms. De Souza arranged voluntary shift swaps when assigned to work on the Sabbath. Over roughly seven months, she arranged four such swaps. Ms. De Souza's immediate supervisor approved these voluntary shift swaps until November 2023, when the supervisor informed her that the Team Leader and Manager, defendant Teresa Meadows, would no longer authorize such arrangements. According to OPWDD's rebuttal to the New York State Division of Human Rights ("NYSDHR"), employees are permitted to make work adjustments when approved by a supervisor. Nevertheless, after the four voluntary swaps, OPWDD refused to approve any further shift adjustments to accommodate Ms. De Souza's religious observance.

During a meeting with her team leader, Ms. Meadows, Ms. De Souza asked why OPWDD would no longer accommodate her religious observance and clarified she only needed the Sabbath off, not the entire weekend. Her supervisor responded that Ms. De Souza "needs to choose because you cannot serve two masters as the Bible states." In that same meeting, Ms. De Souza showed her supervisor language in the New York State Equal Employment Handbook, which states, "An employee is entitled to time off for religious observance of a sabbath or holy day or days[.]" Ms. De Souza asked if this language applied to her situation and her supervisor dismissively responded, "well I am not authorizing it."

Denied both formal accommodation and informal shift swaps, Ms. De Souza had to use vacation days or call out of work to observe her Sabbath. The only occasions on which she called out of work were for Sabbath observance. She later submitted a second formal request for religious accommodation requesting a work adjustment with a colleague who was willing to trade shifts that were outside of the Sabbath and a separate accommodation by way of a shift opening up with Friday and Saturday pass days. Ms. Meadows denied both, claiming they required CSEA waivers she could not obtain. Eventually, OPWDD placed Ms. De Souza on administrative leave for one week and terminated her on May 23, 2024, citing "frequent call outs" despite their knowledge that her call outs were exclusively for the purpose of observing her Sabbath.

Hon. Robyn F. Tarnofsky
June 25, 2026
Page 3 of 8

Ms. De Souza is not the only OPWDD employee who suffered religious discrimination for observing the Sabbath. Confidential Witness 1, a former OPWDD employee, asked for an accommodation to observe the Sabbath. After OPWDD denied the request, the employee called out on the Sabbath. OPWDD then fired the employee for those unapproved absences. This account comes from what Confidential Witness 1 told Ms. De Souza. Similarly, Confidential Witness 2, a long-time OPWDD employee, told Ms. De Souza of several other Sabbath keepers denied accommodations. Plaintiff has not disclosed the name or identifying characteristics of either witness to protect against retaliation.

Ms. De Souza brings failure-to-accommodate and religious-discrimination claims. The discovery she seeks supports her individual and class claims that OPWDD has a pattern or practice of denying Sabbath accommodations in violation of federal and state discrimination laws. This case involves common questions of fact and law involving Defendants' statewide policy of discrimination against Sabbath observers. The collective bargaining agreements and their seniority provisions apply to all similarly situated employees across the state and require adequate discovery of the regions in which OPWDD and CSEA apply those agreements. New York State Defendants produced a spreadsheet showing 34 religious-accommodation requests by employees with Ms. De Souza's title throughout the state: 21 of which were denied, nine of which were "withdrawn" by employee, and the remaining two were approved "in part". We believe this list is likely incomplete because the State searched only for accommodation requests using the word "Sabbath". There are other words that should be searched and the parties are negotiating to expand the search terms to include those words.

Those who were denied accommodations had to choose between their faith or their employment, like Confidential Witness 1 and Ms. De Souza. The employees who withdrew their requests, may have been intimidated by OPWDD and CSEA's refusal to accommodate Sabbath observers. Without proper discovery, this Court cannot know.

II.    **CSEA produced only what its custodians volunteered, leaving three deficiencies in its search.**

On June 10, the parties met and conferred, focusing primarily on New York State Defendant's responses to Plaintiff's discovery requests. The parties also started but did not complete their discussion of CSEA's responses. On June 22, the parties conferred again to discuss CSEA's responses to Plaintiff's document requests, including CSEA's search for responsive ESI. On June 23, we sent a letter to CSEA to address our concerns around ESI.

Ms. Perrin, CSEA's counsel, described her search at the June 22 conference and again in CSEA's letter of June 24, sent at 5:41 pm last night in response to our letter raising issues about CSEA's collection of ESI. According to her, she first emailed the local presidents and the state operations teams her own list of topics and phrases on June 5 and June 11, and those presidents invited her to join the end of an agenda meeting on June 16. She did not send Plaintiff's document requests to anyone; as she put it, she "did not transmit Plaintiff's document requests to the Local

Hon. Robyn F. Tarnofsky
June 25, 2026
Page 4 of 8

Presidents or to CSEA staff" because she does "not expect lay people to read and understand almost one hundred requests." Instead, she asked the local presidents to provide "any information and documents that they had about requests for shift swaps, shift adjustments and reasonable accommodations," using the topics she had identified to guide their searches. She received emails from three of the twelve presidents and would produce those to Plaintiff. By CSEA's own account, its search consisted of whatever its lay custodians chose to volunteer in response to counsel's topic list.

First, this does not meet discovery best practices. A search that depends on what lay custodians volunteer is not the reasonable, counsel-directed inquiry the rules require. CSEA should involve its IT department, identify all potential custodians who might have responsive emails, identify the accounts in which those communications reside, and collect them for the relevant time period. It should then load the collected material onto a document-hosting database for technology-assisted, search-term review. Because local union presidents cannot be expected to identify and collect ESI on their own, this process must be directed by CSEA's counsel, working with its IT personnel or an outside litigation-support consultant experienced in ESI collection in complex litigation of this magnitude.

Second, CSEA has followed up with only a fraction of its custodians. Ms. Perrin received responses from only three of the twelve local presidents and has not explained what follow-up, if any, she undertook with the remaining nine. CSEA should confirm whether each president actually conducted a search, whether they covered all relevant topics and terms, and whether those who produced nothing have confirmed they hold no responsive documents. A custodian's silence does not discharge CSEA's obligation to ensure that all sources of discoverable information are identified and searched.

Third, CSEA's document production is deficient in form. It appears CSEA printed responsive emails to paper and scanned them into non-searchable image files, depriving Plaintiff of the ability to search the production. That does not comply with CSEA's obligations under Rule 34. Under Rule 34(b)(2)(E)(ii), when a request does not specify a production format, a party must produce electronically stored information either in the form it is ordinarily maintained or in a reasonably usable form. *Fed. R. Civ. P.* 34(b)(2)(E)(ii). That option carries a limit: a producing party is not "free to convert electronically stored information from the form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome for the requesting party to use the information efficiently in the litigation." *Covad Commc'ns Co. v. Revonet, Inc.*, 260 F.R.D. 5, 9 (D.D.C. 2009) (quoting Fed. R. Civ. P. 34 advisory committee's note to 2006 amendment). It follows that "it is improper to take an electronically searchable document and either destroy or degrade the document's ability to be searched." *Id.* Courts have applied that principle directly to the conduct at issue here: converting emails maintained in searchable electronic format into paper printouts or scanned image files "does not comply with the option to produce them in a reasonable usable form," and the requesting party is entitled to production in native format with metadata intact. *White v. Graceland Coll. Ctr. for Prof'l Dev. & Lifelong*

Hon. Robyn F. Tarnofsky
June 25, 2026
Page 5 of 8

*Learning, Inc.*, 586 F. Supp. 2d 1250, 1264 (D. Kan. 2008) (ordering re-production in native format where defendant printed emails to PDF and produced paper copies). More broadly, ESI produced in a non-text-searchable format "most likely is not 'reasonably usable'" within the meaning of Rule 34. *Anderson Living Trust v. WPX Energy Prod., LLC*, 298 F.R.D. 514, 526 (D.N.M. 2014). The single-page TIFF production that Plaintiff requests, with load files and extracted text or OCR, reflects the accepted ESI-production standard in this District, as confirmed by the ESI protocol orders that courts here enter to govern electronic discovery. *See Kossel v. Clorox Co.*, No. 7:22-cv-10450-PMH (S.D.N.Y. Mar. 22, 2024), ECF No. 61 (ESI protocol order, entered on the parties' joint motion, providing for production in single-page TIFF format with load files created and produced together with their associated static images, and OCR text files where documents converted to static images are no longer searchable).

### III.    CSEA's own litigation holds show it knows what ESI to search.

At both conferences, CSEA claims it does not know what systems or custodians to search and that the requests would be overbroad and burdensome, given the numerous local officers, regions, and state operations personnel.

During our second conference, we asked Ms. Perrin "was there a search done", and she replied "a search how?"; she continued, "I don't know what you think I'm going to search. If I ask the local presidents whether they have any of that information, and they don't have the documentation, there's nothing for me to search." The next day, on June 23, we sent a letter to Ms. Perrin clarifying that our ESI requests are routine and relevant to Ms. De Souza's individual and class claims, and cited caselaw on the Federal Rules of Civil Procedure.

A producing party does not discharge its discovery obligations by describing the topics of a request to its custodians and producing whatever they volunteer. Rule 26(g) requires a "reasonable inquiry," and that inquiry runs to counsel, not only the client. Counsel "must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched," which ordinarily means identifying and searching the files of the likely "key players," rather than relying on each custodian's own judgment about whether anything responsive exists. *Metropolitan Opera Ass'n v. Local 100, Hotel Employees & Rest. Emps. Int'l Union*, 212 F.R.D. 178, 218-22 (S.D.N.Y. 2003) (involving union counsel where responses were made without reasonable inquiry and no systematic procedure was implemented for document production or retention); *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432-33 (S.D.N.Y. 2004) (counsel must take affirmative steps to ensure that sources of discoverable information are identified and searched, including by communicating with key players). This applies to both paper documents and ESI.

*Zubulake* required counsel to search where they had reason to believe responsive evidence existed; CSEA's duty here is clearer, because its own records identify which custodians and systems hold that evidence. On September 4, 2024, CSEA's Office of General Counsel issued litigation hold letters in this matter (CSEA Matter No. 24-0726), recognizing that "electronically

Hon. Robyn F. Tarnofsky
June 25, 2026
Page 6 of 8

stored information is an important and irreplaceable source of evidence for CSEA." Those holds were directed to identifiable custodians, including CSEA's Director of Information Systems, Manager of Computer Operations, and Manager of Systems, as well as Region 2's Director, its Labor Relations Specialists, and the local presidents for Region 2 and Local 0447. The holds attached an illustrative list of the data to be preserved, including all emails (sent and received, internal and external), word-processed files, spreadsheets, databases, calendars, and personal-information-management data across hard drives and backup media. CSEA then reissued quarterly reminders of these holds to the same custodians from October 2024 through 2026. CSEA cannot simultaneously instruct its own personnel that this ESI is "irreplaceable" and must be preserved, while representing to Plaintiff that it does not know what to search.

### a. Search Terms

CSEA asked the local presidents to look for what they had but ran no defined set of search terms. A party using keyword searches "must carefully craft the appropriate keywords, with input from the ESI's custodians as to the words and abbreviations they use, and the proposed methodology must be quality control tested." *William A. Gross Constr. Assocs. v. Am. Mfrs. Mut. Ins. Co.*, 256 F.R.D. 134, 135-36 (S.D.N.Y. 2009) (requiring custodian informed, quality-control-tested keyword searches and emphasizing cooperation in ESI discovery). CSEA has already agreed to this approach in principle: in its June 24 letter, it represented that "if the parties to this action come up with a list of phrases to employ in electronic keyword searches, CSEA will seek out additional responsive information." Plaintiff asks the Court to hold CSEA to that commitment and direct the parties to negotiate, and CSEA to apply, a quality-control-tested set of search terms across all relevant custodians and accounts.

### b. Emails

According to Ms. Perrin, CSEA employees have CSEA email accounts, but Union officers (local presidents, stewards, etc.) are state employees who use OPWDD email accounts. Ms. Perrin confirmed CSEA searched employee email accounts for at least some requests. However, she did not contact officers below the local-president level (shop stewards, grievance reps, etc.), nor did she provide search terms or a methodology to local presidents. CSEA argues it cannot search officer accounts because they are state employees rather than CSEA employees. However, the question is whether CSEA has "access and the practical ability" to obtain the communications, not who employs the officer or hosts the account. *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 138 (2d Cir. 2007) (documents may be within a party's control where the party has access and the practical ability to obtain them). CSEA's own June 24 letter confirms it has that ability: CSEA states that it asked all of its OPWDD local presidents to "search their work and personal email accounts and devices for anything that might be responsive," regardless of who hosts those accounts. Plaintiff does not ask CSEA to run searches on the State's email system or servers; Plaintiff asks CSEA to search the accounts (CSEA, OPWDD, and personal) that its own officers used for union business and that CSEA concededly has the practical ability to reach. CSEA should also provide to both plaintiff's counsel and the state the OPWDD email addresses for the

Hon. Robyn F. Tarnofsky
June 25, 2026
Page 7 of 8

custodians who are likely to have responsive documents so the parties can negotiate a protocol for searching the OPWDD accounts of the union representatives.

CSEA officers used non-CSEA accounts for union business. An email in Exhibit H to the State's DHR Rebuttal was sent from faye447@verizon.net, which appears to refer to Local 447. CSEA's own supplemental production confirms this practice is not isolated: CSEA Local 429 President Rondell Radcliffe conducted seniority-waiver correspondence concerning a Staten Island DDSO accommodation request from a personal account (ron.bread@yahoo.com), and Local 426's Jaime Chapman handled reasonable-accommodation matters using two non-CSEA accounts (jaime@local426.org and jaimelocal426@outlook.com). That same production also raises a preservation concern: when OPWDD tried to reach a CSEA Local account, it received an "Undeliverable" bounce-back, and Mr. Chapman explained that the CSEA account previously used "isn't active anymore." Those communications should be included in CSEA's search, because CSEA has the access and practical ability to obtain them, knowing which people they employed and the email addresses they used.

### c.  Documents and other files

Beyond email, CSEA's production reflects an ad hoc approach to paper and other files that likely overlooks responsive material. CSEA's supplemental responses confirm the consequences: as to the Long Island DDSO seniority-waiver inquiry, CSEA states it "has not been able to locate any documents related to this request." A reasonable, counsel-directed search, rather than reliance on each custodian's own judgment, will ensure all responsive documents and files are identified and produced.

### IV.  Document Requests 38-53 seek statewide accommodation records that are discoverable.

Document Requests 38-53 seek records concerning Sabbath accommodations statewide. In its June 24 letter, CSEA confirmed that it searched statewide and supplemented its responses to Requests 38, 45, 46, and 48, producing accommodation records from the Sunmount, Taconic, and Long Island DDSOs. That resolves the geographic scope of the search but not its adequacy. CSEA itself notes that its seniority-waiver records do not routinely identify the religious basis for an accommodation request, which confirms that responsive material cannot be captured by a topic-driven search for terms like "Sabbath" and must instead be located through the counsel-directed, search-term-based ESI methodology described above. Plaintiff asks that CSEA apply that same methodology to union locals across the state.

### V.  Further clarification of Plaintiff's requests.

During our conferences, CSEA indicated that they limited their search to only the ISU agreement. However, Plaintiff's requests are not limited to the ISU contract. New York State maintains two collective bargaining agreements with CSEA that apply to OPWDD (the ISU and the OSU), and both contain seniority provisions governing pass days and the posting of vacancies,

Hon. Robyn F. Tarnofsky
June 25, 2026
Page 8 of 8

along with the "operating needs" and "ability to perform" exceptions at issue here. Because the putative class encompasses similarly situated Sabbath observers across OPWDD regardless of bargaining unit, discovery relevant to the OSU is as relevant as discovery relevant to the ISU.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in our letter motion, Plaintiff respectfully requests that the Court direct CSEA to conduct a reasonable, counsel-directed search for responsive electronically stored information and documents, including through the use of agreed search terms, the search of accounts used by CSEA officers for union business, and discovery extending statewide and to the OSU, and to produce all responsive materials.

Respectfully yours,

/s/ Anthony J. Harwood

cc:  All counsel by ECF

Plaintiff's application to compel Defendant CSEA to conduct a search for and produce responsive electronically stored information and documents shall be discussed at the discovery conference scheduled for July 1, 2026. (*See* ECF 140.)

Dated: June 26, 2026
       New York, NY

SO ORDERED

_____
ROBYN F. TARNOFSKY
UNITED STATES MAGISTRATE JUDGE

8